**Robert FINNEY, et al., Petitioners,**

v.

**James MABRY, et al., Respondents.**

**No. PB–69–C–24.**

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Feb. 19, 1982.

Philip E. Kaplan, Jack Holt, Jr., Phillip McMath, Little Rock, Ark., for petitioners.

Steve Clark, Atty. Gen., A. Carter Hardage, Asst. Atty. Gen., State of Ark., Little Rock, Ark., for respondents.

## MEMORANDUM OPINION

EISELE, Chief Judge.

This case, which was originally filed in April 1969, is a class action on behalf of all inmates confined in the Arkansas Department of Correction. The plaintiff class challenges the constitutionality of the conditions of confinement at the various institutions administered by the Arkansas Department of Correction. During the long history of the case numerous hearings have been held, and the Court has entered many orders determining the rights of the parties. In addition, the parties entered a Consent Decree in October 1978, which was made an order of this Court, setting forth certain minimum requirements that the respondents agreed to meet in the administration of the Arkansas Department of Correction. The Consent Decree set up a mechanism to monitor the degree of compliance by the respondents with the terms of the Decree, and allowed either party to petition the Court for dismissal of the case upon compliance with the terms of the Decree or upon the expiration of eighteen months from the date of the Decree, whichever occurred first. The Arkansas Department of Correction operated under the Consent Decree until March 1981, when it became apparent that the cooperation of the parties, necessary for continued progress within the framework of the Decree, was no longer forthcoming. Upon the request of the plaintiff class, a hearing was scheduled for August 1981 to determine the extent of compliance by the Arkansas Department of Correction with the Constitution, the Consent Decree, and other prior orders of the Court in this case.

The plaintiff filed an amended petition setting forth approximately forty particular practices or conditions of the Arkansas Department of Correction which it alleged to be unlawful. The respondents denied that any conditions or practices of the Arkansas Department of Correction were unlawful, and requested that the case be dismissed. In addition, the respondents submitted at trial a list identifying approximately fifty additional issues which they contended were raised by the Consent Decree or prior orders of the Court, and therefore were in dispute at the hearing, although not included in the plaintiffs' petition. The plaintiffs agreed that the issues listed should be considered in dispute, so that the record could be made complete on the extent of compliance of the respondents. There were therefore pending approximately ninety matters upon which a determination was to be made concerning the extent of compliance of the Arkansas Department of Correction with the Constitution, the Consent Decree, and prior orders of the Court.

As would be expected, the degree of compliance demonstrated by respondents differed for the various issues in dispute. For many of the identified issues, the Court found that the respondents were in compliance, and in many cases had been in compliance for some time. In other areas, the Arkansas Department of Correction had

changed practices or policies shortly before or during the trial, or had adopted plans to do so, and the Court found that, with the implementation of those changes, the respondents would be in compliance. There were a few matters which were identified by the Court as still-existing problems in the Arkansas Department of Correction, and the respondents were held, with respect thereto, not to be in compliance with either the Constitution, prior orders of the Court, or the Consent Decree.

The conclusions of the Court concerning the degree of compliance of the respondents on the various identified issues, and the factual findings in support thereof, were stated on the record during the course of the trial and during the oral arguments following the trial on September 28, 1981, and October 5, 1981. The purpose of this Memorandum and Order is to summarize and supplement some of the findings and conclusions of the Court previously made from the bench during the trial, at the end of the trial, and during oral argument. The findings and conclusions so made from the bench are hereby ratified and readopted. If, however, there are any conflicts or inconsistencies between those findings and conclusions and the ones stated in this written Memorandum, the latter shall supersede and control.

## I

Although this case was originally filed on behalf of all inmates of the Arkansas Department of Correction, housed in all institutions of the Department, it has become apparent that the problems remaining involve primarily the Cummins Unit and, to a lesser extent, the Tucker Unit. The remaining institutions operated by the Department are essentially in compliance with respect to their "local" conditions of incarceration. The evidence presented at trial centered upon conditions at the Cummins Unit and the Tucker Unit, as did the arguments of counsel after the trial. The attorney for the plaintiff class conceded in a letter to the Court dated October 13, 1981, that "[s]ince the entry of the Consent De-

cree in this matter on October 15, 1978, the Department has achieved constitutional status at some of its institutions," but he did not specify any certain institutions. There is no question but that the conditions at the Women's Unit, which has been highly acclaimed by experts in the field, are sufficient to meet all the requirements of the Constitution and the prior orders of this Court. The Court also finds that the conditions at the Benton, Wrightsville, and the Diagnostic Units, and all of the separate work release units satisfy such requirements. It is therefore the opinion of the Court that these institutions will not require continuing supervision. Furthermore, the Cummins and Tucker Units will need only limited court controlled supervision during the "windup" period discussed below.

It should be noted that the Court is finding only that the conditions specific to the named institutions are being approved. As will be discussed in this opinion, there are several matters which apply to the entire Department, such as the provision of medical and mental health care, the grievance procedure and the affirmative action program, as to which a finding of total compliance cannot be made at this time. As to those services which are provided to all inmates of the Department on a system-wide basis, rather than on an institution by institution basis, the "release" of the specified institutions has no effect. The Department remains, of course, under an obligation to provide those services in a suitable manner to all inmates in all units, not just to those inmates at the Cummins and Tucker Units. As to all matters that are provided on a "local" rather than a "system-wide" basis, all units except Cummins and Tucker are in compliance.

It should also be noted that the release of these institutions does not mean that the Arkansas Department of Correction will necessarily be free of all future scrutiny concerning the conditions at them. The attorney for the plaintiff class opposed the release of any particular institutions or the dismissal of the suit as to any specific issues

until the entire case was dismissed, apparently because of his concern that unless the entire department and all issues remained under the direct or indirect supervision of the Court until the Department is in compliance on all particulars, that the Department would "backslide" in those areas released from control in order to more easily bring those areas still under direct scrutiny into compliance. Although such a possibility does exist, the Court concludes that all deference should be given to the intentions of the respondents not to allow such "backsliding" to occur. The respondents are aware of their responsibilities to maintain the entire Department in a constitutional manner and have, indeed, made exceptional progress toward that goal. It is very doubtful that the success that they have worked so hard to achieve over the years would be forfeited easily through neglect or a lack of perseverance. Furthermore, the ruling of the Court is only that the institutions in question are in compliance with the requirements of the Constitution and the prior orders of the Court at this particular time. This decision would not preclude the inmates from raising the issue again in the future if conditions fall below the constitutional minimums. At some point, hopefully soon, jurisdiction over the Department must be relinquished completely by this Court and the respondents must be trusted with the responsibility to maintain conditions at the level that allowed dismissal of the case, without continual monitoring by the Court or a Court-approved third person. To relinquish active oversight in stages, and thereby to transfer greater responsibility back to the respondents in a somewhat gradual way, will increase the independence of the Department and will make this litigation more manageable for all concerned.

The remainder of this opinion will therefore deal with and resolve the disputes between the parties concerning the degree of compliance by the respondents within the requirements of the Constitution, the Consent Decree, and the prior orders of the Court in the various substantive areas, or issues, identified.

II

With respect to the largest group of issues identified, the Arkansas Department of Correction is in compliance, and had been in compliance for some time before the hearing. For many of these issues, which include such matters as the adequacy of and access to the law library, mail regulations and the opening of legal mail, and provision for religious requirements for Muslim inmates, the reports prepared by the Compliance Coordinator indicate that the Arkansas Department of Correction was in compliance at the time the report as to those matters was prepared. Although reluctant to concede any issue, the attorney for the plaintiff class did agree that further evidence beyond the reports of the Compliance Coordinator would not be required in order for the respondents to carry the burden of showing compliance. The Court accepts as true the uncontested findings of the Compliance Coordinator, and concludes that the Arkansas Department of Correction is in compliance with the Constitution, the Consent Decree, and other prior orders of this Court on all matters identified by the respondents in the list submitted which were not actively contested by the attorney for the plaintiff on the record during the trial of this case. These matters have been identified to the Court by the following abbreviated references which are known to the parties.

Use of force *policy* (emphasis supplied)
Running to and from work
Any punishment not authorized
Dental care
Two inmates in two-bunk punitive cell
Reporting requirement for exceptions
Privileges
Personal appearance
Discrimination against Muslims
Muslim diet
Muslim religious practices
Proper diet on punitive
Exercise on punitive
Legal advisor to inmates
Law libraries
Access to law libraries

Opening of legal mail

Mail regulations

Visiting regulations

Charging officer not on committee

No adjudication solely on informant

Informant's name and written statement must be before committee

Contraband must be presented to committee

Witness statement must be read into tape

Entire hearing must be tape recorded and kept three years

Hearing to be conducted weekdays between 6:00 a. m. and 6:00 p. m.

Written charges given to inmate 24 hours prior to hearing

Composition of committee: chairperson plus one security plus one treatment

Review of chief security officer prior to hearing

Charges/consequences fully explained

Charging officer excluded from hearing room

No supervision of inmate by charging officer during time of hearing

Written reason to inmate within 24 hours after hearing

Statement if no black on committee

No racial discrimination allowed in disciplinary proceedings

Minor discipline

It should also be noted that a few issues which were raised in the petition and amended petition by the plaintiff class were not actually disputed at trial. Specifically, the plaintiffs had alleged subversion by the respondents of the procedure for the investigation of complaints of excessive force, staff shortages resulting in curtailed time for recreation and inadequate supervision during recreation periods, and termination of the Compliance Coordinator as particular matters for which the respondents should be held to be not in compliance with the Constitution, the Consent Decree and prior orders of the Court. However, at times before and during the hearing these particular allegations were either abandoned by the plaintiffs or resolved after rulings by the Court. Except for the allegation of staff shortages for recreation, these allegations had raised new issues not addressed in the Consent Decree or court orders prior to the Consent Decree; therefore, the record is clear that they are not pending and no new or specific findings are required at this time. The problem of adequate supervision during recreation is part of the larger problem of inadequate staffing of the institutions at all times, and will be met through the plan for increased staffing as discussed herein below.

III

A second group of issues may be identified as to which the Arkansas Department of Correction was in compliance at the conclusion of the hearing and as to which it is not necessary to determine if the prior practices of the respondents would have been sufficient if still in effect. This group includes such matters as cleanliness in the East Building at Cummins, the grievance procedure, and provision of medical care for inmates. As to these matters the Court is satisfied that the recently adopted changes in practice meet the applicable standards, but does not, thereby, intend to sanction or condemn the prior practices of the respondents. It would be a waste of judicial resources to analyze carefully and technically each allegation about prior practices that have now been discarded in order to determine if they would be acceptable if still in effect. With respect to such issues the state of compliance of those policies or practices which were in place at the conclusion of the hearing will be examined without regard to the fact that the hearing itself may have been the catalyst for the changes in one or more of such areas.

█ As to most matters pertaining to conditions in the maximum security facility of the Cummins Unit, the Court found that the respondents are now in compliance, but will require that record-keeping procedures be established and that the newly adopted practices and procedures be monitored for a period of time to assure continuing compliance. The plan established by the respondents to rotate officers through the East

Building on a regular basis, as required by the Consent Decree, is adequate if followed in practice. Similarly, the problem of maintaining minimum sanitation standards in the East Building has been accomplished recently through the efforts of Mr. Howard Smith, the maintenance director. As to both officer rotation and sanitation standards in the East Building of the Cummins Unit, the Court has concluded that the respondents are now in compliance with the Constitution, the Consent Decree and prior orders of the Court, but that continued compliance should be monitored before the Department is actually released on these issues.

The Court also concluded that the respondents are in compliance as to the repair of damaged facilities in the East Building and the periodic reevaluation of residents of the maximum security facility, except that further documentation will be required. The Arkansas Department of Correction has recently adopted a procedure to effectuate prompt repair of damage in the East Building, and has begun to keep an inventory of necessary supplies so that the time lapse before a repair or replacement can actually be made will be shortened. A new lighting system has also been installed in the maximum security facility and was reported by the attorney for the respondent to have become operational. Assuming that the procedures function as planned by Mr. Smith, the maintenance director, the Court is satisfied that repairs will be carried out in a satisfactory manner. However, because this, too, involves very recent changes in the procedures of the Department, some period of actual practice will be required before the Court may relinquish oversight. Furthermore, because incidents such as that involving Mr. Sherrod, which the Court believes to be the exception rather than the rule, are likely to occur if needed repairs are not reported and documented in a systematic fashion, an appropriate chain of paperwork must be established. The Court will require that a record report be made promptly of any needed repairs in the East Building by the person responsible for administration of that facility. The report must show the day that the fixture was damaged. After the report is sent to the maintenance department, the schedule for correction of the deficiency should be noted. Finally, after the repair has been completed, the date should be noted. Such a "paper-chase" will aid the Department in accomplishing the repairs promptly, and will enable later review of the problem by the Court if necessary.

As stated above, the Court also found that the respondents are now in compliance on the evaluation of residents of the East Building of the Cummins Unit and periodic reevaluation of those persons, but concluded that more complete records should be maintained. A record must be made of what the evaluation consisted of and should indicate the reasons that purportedly justify keeping the person in maximum. Any psychological counseling or testing, or other reference and the results thereof, should be noted. If no such reference is felt to be required, the reason should be noted. The maintenance of such records will cause the persons making these decisions to have to consider the problem thoroughly in all cases, and will document information for later reference within the institution, and by the Court if necessary.

The Court concluded that the respondents are now in compliance on the maintenance of constitutional conditions for those housed in punitive isolation. Very recent improvements have been made in programs for exercise and recreation, and in lighting and sanitation as discussed above, which are applicable to persons housed in punitive isolation. The major contested issue regarding punitive isolation was the policy of the Department of removing mattresses during daytime hours from the cells of those persons being held in punitive isolation. Without approving or disapproving the policy, the Court concludes that the removal of mattresses, and the denial of other privileges by the respondents as punishment, are matters fully within the discretion of the administrators of the prison. These are matters which reflect attitudes toward the use of punishment as a method of manag-

ing inmates within the context of a prison and do not rise to constitutional magnitude as presently enforced. The Court concludes that the conditions imposed on those persons being held in punitive isolation, as enforced at the conclusion of the hearing, are in compliance with the Constitution, the Consent Decree, and all prior orders of this Court.

The Court also concluded that with procedural changes recently adopted by the Department of Correction, and with the addition of a recording requirement now imposed by the Court, the disciplinary procedures followed by the respondents meet standards required by the Constitution, the Consent Decree, and prior orders of the Court. During the time the trial was being held, personnel of the Department finalized a new form to be completed by the disciplinary committee during the course of every disciplinary proceeding. A copy of the new form was made an exhibit during the closing arguments on this issue, and counsel for the respondents represented that the forms would actually be in use at the institution within a short time from that date (after they had been received from the printer). In addition, a new policy has been formulated concerning disciplinary procedures, and Mr. Battles and Mr. Dorsey testified on behalf of the Department of Correction that training sessions had been conducted to aid personnel in implementation of the new policy and forms. Counsel for the plaintiff class conceded, and the Court agrees, that if the new form is effectively used, many past problems that have been noted regarding the disciplinary procedures will be resolved. However, because the forms are so new, the forms and policy were not actually in effect in the Department at the time the hearing was recessed, some period of monitoring the new disciplinary procedures will be required. Furthermore, one problem with past disciplinaries that was not adequately dealt with by the new form is the require-

ment that medical personnel be consulted before a disciplinary is imposed for malingering when the inmate alleges a medical justification for refusing to work.[1] The forms do state that such consultation is required. However, it is the opinion of the Court, as expressed at the oral argument, that some record must be made of those who have checked the medical records and determined that the inmate has not been given an excusal from work for medical reasons. There must be a record made which identifies the person in the infirmary who is giving the information to the Disciplinary Committee. The notation may be written in the medical records, in the disciplinary records, or both, at the preference of the Department. Although the petitioners charged in the amended petition that the respondents' provision for counsel substitutes during disciplinary proceedings was inadequate, counsel for the petitioners agreed during the oral argument that recently implemented practices of the Department will satisfy constitutional requirements. Finally, the Court has concluded that the continuing use of multiple overlapping charges by the Department for a single incident does not create a problem as long as the practice of punishing for only a single infraction is continued. For example, the evidence showed that an inmate will often be charged with refusal to work, staying in living quarters, and refusal to follow the order of an officer for one incident in which he stayed in the barracks and refused to go to work. The evidence also demonstrated, however, that the same inmate would be given the same penalty as if he had been found to have violated only one rule. As long as multiple punishments are not imposed, charging the inmate with multiple infractions does not implicate constitutional standards. The conclusion of the Court was that the respondents would be in compliance if the new practices and procedures were implemented, as represented to

---

1. A related problem has been the alleged failure of the respondents to employ an adequate medical classification system that would define the capacity of the inmate to perform certain jobs in a meaningful way. The Department of Correction has developed and is implementing a new classification system that will be adequate if put into operation as planned. *See* discussion, *infra*, at 1034.

the Court, and if records were made on the medical authority contacted on malingering charges, as required by the Court.

A new grievance procedure was also adopted during the course of the trial and modified following a discussion on the record concerning it. The Court approves the new procedure as modified, and finds that with the implementation of it the respondents will be in compliance on that issue. The implementation of the procedure is, however, an important and fairly complicated task that will require the training of numerous personnel at the institutions. Therefore, as with other recently adopted procedures and practices, the progress on the implementation and use of the grievance procedure must be monitored for a time. In this regard, the Court will require the Department to submit periodic self-evaluations for a short time on the progress that is made.

The Court has concluded also that the new classification system adopted by the Department, if implemented as described during the hearing, complies with the Constitution, the Consent Decree, and prior orders of the Court. It was planned that the new work classification system would be in effect at the institutions by the end of 1981 and that all manuals would be written and training completed concerning it by July 1982. Implementation of the new classification system is closely related to the medical contract and the intake unit procedures, both of which are also new. Therefore, progress toward implementation of the new medical classification system will be monitored. If it is put into effect in the way and according to the timetable planned, the respondents will be held to be in compliance.

■ An allegation by the petitioners, related to the classification system, was that the requirement that some inmates work in jobs that required long hours seven days a week, particularly jobs in the kitchen at Cummins, was unconstitutional. The evidence indicated that some jobs to which inmates were assigned did require significantly greater hours of work than did other jobs and that assignments to those jobs were often perceived as punishment by the prisoners, even if that were not the intention of those making the assignments. The Court concluded that, although it might be more equitable not to have such disparity in working hours among the inmates, and that it might be a good practice to rotate all or most inmates through those jobs, nevertheless these were matters within the administrative discretion of the management personnel of the prison and did not violate constitutional standards or any prior order of the Court.

■ The structure for the provision of medical services within the Department of Correction has been dramatically changed within the last several months. The Department had maintained a staff of medical personnel as its employees and had operated the medical facility directly. A contract for the provision of medical services has now been entered with a private company. Virtually all physicians in the Pine Bluff, Arkansas, area are to be involved on a limited basis in supplying medical care at the various institutions. The company will maintain a pharmacy service and emergency medical capability. All personnel of the medical facility will be employees of the independent company rather than personnel of the Department of Correction. Also, the use of inmate aids in the infirmary facility will be greatly reduced, and access by inmates to the medical files of other inmates will be more closely restricted and regulated. There are plans also, with the addition of new security personnel, to change the place of sick call to a more private area, and possibly to change the time of sick call.[2] Although the Court does not feel it is necessary to evaluate the medical services offered by the respondents prior to the con-

2. The Court has concluded, contrary to the allegations of the petitioners, that the time and place of sick call are administrative decisions within the discretion of prison management.

The Court therefore finds no violation of a constitutional standard or of a prior order of this Court in the fact that the respondents have held sick call at 4:30 a. m.

tract, it does clearly appear that the services provided will be greatly improved as a result of the contract if implemented in accordance with the testimony. A trial period will be required to allow the contract system to become fully operational before its success may be adequately measured. The provision of medical services is, therefore, another area that must be monitored for a time before it may finally be said that the respondents are in full compliance. The Court will require periodic reports on the progress of the new medical services system and its capability to adequately meet the needs of the inmate population.

The Court has concluded that the respondents have supplied adequate amounts of clothing and sanitation supplies at the Cummins and Tucker Units. There was evidence that there were problems with such supplies during periods in the past. However, the Court is satisfied that those problems have been resolved and that, with the increase in maintenance staff, there is a more systematic approach that is expected to insure that such problems will not arise in the future. The respondents are, therefore, in compliance with the standards of the Constitution, the Consent Decree and prior orders of the Court on the provision of minimum supplies of clothing and sanitation items.

With recent improvements in the kitchen and planned improvements in the shower areas, it is also true that the respondents will have adequately met applicable sanitation standards at the Cummins Unit.[3] Most evidence presented on the question of sanitation concerned conditions in the kitchen. Warden Sargent has now placed the kitchen under his direct supervision and impressed the Court that he recognizes the importance of the issue, and that he intends to use his best efforts to insure that the kitchen produces nutritionally adequate foods in a sanitary manner. A new boiler and a new scullery have been installed and will soon be operational, if they are not at this time.

Examination reports by the state Health Department show that, although there have been some problems, for example with hot water, the kitchen has passed inspection. Mr. Smith, the maintenance director, explained the improvements that are being made in the shower areas at the institution and outlined the schedule for completion of those improvements. The Court concludes that the prior problems with sanitation that have existed have been largely resolved and that there are definite plans for improvements and a commitment to carry through with those plans. The completion of the planned improvements will be monitored, and the Court will require periodic status reports on the operation of the kitchen, particularly the availability and use of the new boiler and scullery. Therefore, considering those improvements, the Court will not find that the respondents are not in compliance in the maintenance of minimum sanitation standards.

The availability of notary service to inmates is another matter concerning which the Department of Correction recently implemented a new policy, and the Court may find that the new policy is adequate without the necessity of examining past practices of the Department. A new schedule for notary service was put into effect by the Department on May 21, 1981, and was introduced at trial as petitioners' exhibit 81–111. Counsel for the petitioners stated at the arguments that complaints about the lack of notary service had sharply decreased since the new schedule was adopted, and that it appeared to be adequate. The new schedule is so new, however, that it would not be proper for this Court to dismiss the issue without allowing some time to monitor the availability of notary service to determine if the new schedule is retained and if it will indeed be adequate to allow access by inmates to notary service as needed.

Similarly the Department has recently adopted a "System Six" as a method of evaluating youthful inmates that are trans-

---

**3.** The evidence presented by the plaintiffs concerned sanitation standards at the Cummins Unit of the Arkansas Department of Correc-

tion. The parties appear to be in agreement that sanitation has not, in recent times, been a problem at other units of the Department.

ferred from the Tucker Unit to the Cummins Unit. Although little evidence was presented to the Court regarding how the process works, or how effective it is to accomplish the purpose, counsel for the petitioners indicated at the closing argument that it is adequate, if maintained at the present level. The Court will accept this evaluation and finds that the recently adopted process for the evaluation of youthful inmates transferred to the Cummins Unit complies with the requirements of the Constitution, the Consent Decree, and prior orders of the Court. Again, the operation of the system will be monitored until it has been actually in operation for a reasonable time before a final determination of compliance is made.

As to the matters just discussed, the Court concludes that if the respondents maintain conditions as they were at the time the hearing was concluded, or in some cases (as indicated above) complete planned improvements which were scheduled at the time the hearing ended, a final finding of compliance will be made. The Court will require that a final report be filed covering all outstanding issues sometime during the week of May 3, 1982, such report to reflect the factual developments concerning compliance and implementation that have occurred since the August 1981 hearings. The Court anticipates that the plaintiffs, with appropriate assistance as discussed below, will then have until June 14, 1982, to file any objections or exceptions to the report or to otherwise show cause why the respondents should not be found to be in compliance with the Constitution, the Consent Decree, this Opinion and Order, and all other prior orders of the Court, and why this proceeding should not be dismissed. If objections and exceptions are filed, the Court will give respondents until July 6, 1982, to respond. If a hearing is necessary, it will be scheduled for August 9, 1982.

## IV

■ There are two issues, the provision of mental health care and the use of inmate security, as to which the respondents made significant changes shortly before and during the hearing, which the Court finds will, if implemented, cure the defects in compliance, but as to which, nevertheless, the Court feels compelled to make a specific finding that the prior practices of the respondents were unconstitutional. The prior inmate mental health arrangements of the Department and the use of inmates in positions of power and control over other inmates, as reflected in the evidence, were unconstitutional, and continuation of those practices could not have been further tolerated. The respondents must understand that they may not revert to the old practices, regardless of lack of funds, or any other circumstance that might prompt a desire to do so. However, the new mental health facility and the new practices of the respondents bring them within compliance with the standards of the Constitution, the Consent Decree, and prior orders of the Court.

The Department of Correction has made drastic improvements during the history of the case in the mental health services available for inmates. The evidence indicates that personnel of the Department, who appear to have first been skeptical about the need for such services, now recognize the need and the assistance that can be provided by the mental health staff. When the case was originally filed, the Department had no mental health personnel. During the course of the most recent hearing, a separate facility with space for 44 inmates with the most severe needs became operational at the Diagnostic Unit as an interim facility to be used until the planned new permanent facility for mental health is completed. This progress shows the dedication of the Department to the long-term resolution of this serious problem. The Court was impressed with the testimony of Drs. Mobley and Powitzky concerning the needs for mental health programs and their efforts to meet those needs. These efforts are laudable and have brought the Department into a situation now where the Court can and does find, with the opening of the interim facility, that the respondents are in compliance.

The Court is equally convinced, however, that prior to the opening of the interim unit at the Diagnostic Center the situation of the Department in supplying mental health services was intolerable. As the evidence shows, the need is such an important one and the prior situation was so clearly inadequate that the Court is compelled to specifically state its conclusion that provision of a separate facility and treatment for the most severely mentally disturbed is constitutionally required. Persons who are severely sick simply cannot be held in custody unless they are provided with necessary medical services. Mental health treatment is clearly a necessary medical service in certain cases. Many inmates who have mental and emotional problems, and need temporary or "outpatient" type of treatment or counseling by psychiatrists or other mental health personnel, may, of course, remain in the general population; but there must be some manner of dealing with them while in the population. A facility such as had been provided in Barracks 16 may serve this purpose. However, in addition, there must be a permanent, separate facility so that those people who are most severely mentally disturbed may be removed, for their own protection and for the safety of others, from the correctional environment of the general population and provided with the treatment and services they need. Such a separate facility that is adequate for the present needs of the Department is now operational, and the respondents plan for a permanent facility to be built within the near future.

The Court also concludes that, if the institutions are staffed as planned, the respondents will be in compliance in providing for adequate security personnel to protect the lives of inmates. Nevertheless the Court feels it imperative to state specifically that the practice of using inmates as security personnel, with power over other inmates, is unconstitutional and may not be reverted to by the Department. The records of staffing introduced at trial demonstrate that the institutions, particularly the Cummins Unit, have been severely understaffed. The respondents have historically made up for the deficiency in free-world security personnel at the institutions by using trusted inmates in security positions. As the Court has discussed in prior opinions in this case, at one time the Cummins Unit was operated almost entirely by inmates with only a skeleton staff of free-world persons. The number of inmates in security positions has been reduced drastically over the years, as ordered by the Court. The transition from inmate to free-world control has been gradual, as it had to be. At the August 1981 hearing it was established that inmates were still being used as "turnkeys" and "floor walkers"[4] at the Cummins Unit. However, the respondents also introduced evidence at the hearing concerning a plan that has been adopted which calls for the Department to hire 128 new correctional officers over approximately a seven month period beginning in June 1981 and completed by February 1, 1982. Of the 128 new correctional officers, 116 are to be assigned to the Cummins Unit and eight to the Tucker Unit. *See* petitioners' exhibit 81–114. With the addition of these free-world security personnel and the staffing plan that has been adopted, it will be possible for adequate security to be provided without the use of inmates as security personnel. Accordingly, the respondents represented a firm and fixed intention to phase out the use of inmates in positions of control entirely, including the positions of floor walkers and turnkeys as those jobs existed at the time of the hearing. Inmates will still be used as turnkeys on the riot gates, but only to mechanically open and close the

---

4. These terms are commonly used by the parties and were defined on the record at the hearing. Briefly, a "turnkey" is the person in charge of opening and closing the various barracks and corridor gates that control movement in the corridors and between the barracks. A "floor walker" is a person housed in a barracks who is responsible for maintaining peace and order within the barracks, reporting problems or infractions, and summoning help if necessary. There was much evidence of the abuses of the inmate control system and of its lack of effectiveness in protecting the safety of other inmates.

gate under the direct supervision of a free-world guard. The turnkeys will exercise no inmate control discretion whatsoever. Under this plan, as represented to the Court during the hearing and arguments, the respondents will be in compliance on the issue of adequate inmate security staffing.

As stated on the record during the trial and the arguments, the respondents will not be allowed to return to the use of inmates in security positions at any of the institutions of the Arkansas Department of Correction. Inmates may not be placed in positions of authority over other inmates and may not be given power to exercise discretion in the control of other inmates in any way. The use of inmates in such control positions is unconstitutional. The respondents are to have phased out the use of all inmates in such positions on or before Monday, April 12, 1982. An injunction will be entered permanently prohibiting the respondents from placing inmates in positions of authority or discretion and control over other inmates after that date except in the most serious emergencies when absolutely no alternative for control is available and, even then, only for the minimum period necessary to bring the situation under the complete control of free-world authorities.

■ The respondents understand that the increases in staffing that are planned must be carried out. The number of free-world personnel working at the institutions has not been adequate to protect the safety of the inmates on a 24 hours basis as, indeed, respondents fully recognize. The Court is hesitant to require that a specific, rigid staffing pattern be maintained. Such matters are better left to the reasonable discretion of those whose job it is to manage the Department so that needed flexibility is available to adapt to changing circumstances. The Court is concerned, however, that minimum constitutional standards be met. The Court is satisfied that if the staffing plan is implemented as described during the hearing and the arguments those standards will be met. The Court is equally convinced that the past staffing of free-

world personnel at the institutions has been inadequate. This deficiency in staffing has, in turn, contributed to most of the problems of the system. The respondents have the responsibility to staff the institutions with free-world personnel in such numbers, of such professional quality, and in such manner as will adequately protect the safety of the persons incarcerated in those facilities. The new staffing plan will meet this responsibility if the correctional officers are hired, trained, motivated, and scheduled to work at the institutions as it was represented to the Court that they would be. No return to the *status quo ante* is constitutionally permissible.

### V

■ There are several issues as to which the Court has concluded that the policies or practices of the respondents have not complied with the requirements of the Constitution, the Consent Decree or the prior orders of the Court, and as to which the respondents have not as yet adopted proposed changes that would comply. One such issue, involving the procedural requirements that must be followed before a person may be placed in administrative segregation and the conditions that may be imposed in administration segregation, has been discussed in a separate order of this Court entered on December 15, 1981. Other matters as to which the respondents are not in compliance, specifically open barracks, overcrowding, affirmative action in the hiring of minorities, integration of the East Building and Barracks 14 and 16, and the use of racial slurs by officers in the presence of inmates, are discussed herein.

As previously noted by the Court, the problems of overcrowding and inadequate security are closely related in the context of this litigation. Although actual lack of space could be a constitutional deprivation resulting from overcrowded conditions in some circumstances, that is not the principal problem faced at this time by the Arkansas Department of Correction.[5] The ev-

**5.** The provision of a minimum amount of space    for the number of inmates confined at the insti-

idence indicated that, by the time of the hearing, the respondents had sufficiently reduced the number of inmates housed in the Cummins Unit so that overall population limitations had been met. As a result, in most parts of that institution the sheer number of inmates confined was not a major problem. The crowded conditions in certain barracks of the Cummins Unit, however, make it impossible for the inmates living therein to be adequately protected or supervised. For example, although a large number of inmates are housed in Barracks 19, the multiple use building, the barracks is arranged in such a way that adequate supervision is possible despite the large numbers, and security has not been a problem there. This is not true, however, in Barracks 5 through 12 at the Cummins Unit, the "100–man" or "open" barracks. In those eight barracks, the placement of double bunks along the walls and in the rear areas in the close proximity that is required makes it virtually impossible for a security guard to have an unobstructed view through the barracks from any angle. This inability to effectively monitor the barracks is made even worse by the practice of permitting[6] some inmates to drape blankets over the bunks to create some sense of privacy in the large and crowded room. The abilities of the guards to supervise the barracks is hampered also after lights have been turned out because the area of the barracks farthest from the hall (of which vision is greatly blocked by the bunks) is also the darkest area. The inadequate staffing of the Cummins Unit, as discussed earlier, has further complicated the problem. However, the increase in security personnel that is planned may not be enough to completely cure the problem.

The Court has attempted to interfere as little as possible with the daily administration of the Department of Correction throughout this litigation. It has been the practice of the Court to allow the respondents as much flexibility as possible in devising solutions to the various problems faced at the institutions, as long as minimum standards are established. It is the intention of the Court to maintain this practice for the resolution of this problem, if possible. With this objective in mind, the Court, by an order filed December 1, 1981, required the respondents to report to the Court in the following way:

> The respondents shall report ... how they would implement an Order by the Court that the population in the eight barracks in question be reduced to 90 inmates within a period of four months and further reduced to 80 inmates within the following four months. The respondents should indicate how they would respond to such an order, what problems would be created by such an order, and how they would deal with the increased population problems that would result from that type of order. The respondents should also suggest alternatives which might make such an order unnecessary, such as internal patrols, or an adequate surveillance or communication system. The respondents should only suggest such alternatives that they consider feasible and which could be actually implemented within the institution by August, 1982.

The report of the respondents recounted briefly the history of the large open barracks and the reductions in population and improved conditions therein brought about by prior orders in this case. The respondents also provided statistical data concerning the number of inmates to be housed at Cummins, and the available bed space under existing arrangements in the barracks. In conclusion, the respondents stated that "[t]he bottom line of all of this is that the Department does not have available beds to absorb 80 or 160 inmates currently being housed in the open barracks at Cummins."

---

tution has been an issue during earlier stages of this litigation, and has been the subject of prior orders of the Court. *See, e.g., Finney v. Hutto,* 410 F.Supp. 251, 254–58 (E.D.Ark.1976).

**6.** Although the draping of blankets over the bunks in that way is against regulations, the respondents have not stopped the practice by the inmates, and therefore its effects must be considered as if the practice were officially permitted.

The respondents did not, however, state any specific new alternatives for solving the inmate safety problem without reducing the population in the open barracks. The respondents did point out the increases in security staff at the Cummins Unit that have occurred during and since the August 1981 hearing, and indicated their belief that the additional personnel should solve the safety problems in the open barracks cited by the Court. It was argued that the staffing patterns at the institution are now in place, as it was testified they would be during the hearing. "There is an officer present in the hall between each of the facing open barracks at all times. In addition to other officers periodically present in the barracks, there is a patrol officer whose only duty is to patrol the barracks." Response filed December 28, 1981, at p. 5. According to the testimony at the hearing and the description of the respondents, there are also other security personnel on duty in the institution performing certain tasks, such as the "shake-down detail," which should make the institution more secure throughout. The respondents also pointed out, as had been testified at the hearing, that the Department plans to place telephones in the hallways between each of the two facing open barracks for use by officers to obtain security assistance. Although the respondents were the ones, during the hearing, who originally suggested the use of cameras or sound equipment within the open barracks to allow limited numbers of security personnel to more effectively monitor each of the open barracks, they rejected such as an option in the Response because such fixed devices would be amenable to tampering or destruction by inmates. The respondents did suggest that the Department "has made a decision to purchase" a "Body Alert System" for use by security personnel throughout the Cummins Unit. As described by the respondents, in that "System" each officer would carry a small transmitter with which he could communicate with a person monitoring a receiver located at the telephone switchboard, a secure area. The respondents conceded, however, that this equipment is very expensive, the Department at this time does not have the funds to purchase the equipment, and it is not known when such funds might become available.

The position of the respondents was, basically, that improvements that have been made, or which are planned, in security at the Cummins Unit, as described at the August 1981 hearing, are sufficient to solve any security problems created by the overcrowding the Court found in the 100-man barracks, and therefore further measures should not be required. This position, however, reflects a misunderstanding of the Court's statements concerning the problem during the hearing and the intentions of the Court in the December 1, 1981 Order requiring a report from the respondents.

The Court has concluded that some additional measures are required to make the 100-man barracks reasonably safe. It is true that the problems of the number of security personnel on duty and the kind of equipment they have at their disposal, the use of inmate security personnel, the number of inmates housed at the institution, and many other factors are all related in determining the level of security and protection provided at the institution. Although the Court has ordered that the respondents will no longer be allowed to use inmates as security personnel with discretion over the actions of other inmates, it has attempted to provide the respondents with flexibility in how they will "juggle" the other factors to achieve the required result of a prison that is both secure and safe. The increases in security staff that the respondents have planned, and are implementing, were necessary and should be sufficient. However, the finding that the staffing patterns proposed for security personnel would be adequate did not mean that no other factors affecting security would have to be adjusted. Even with the increased personnel, the respondents are not able to adequately supervise the 100-man barracks as they are presently arranged. As discussed above, with bunk beds and blankets blocking the view, an officer in the hallway between the open barracks cannot

monitor what is happening in all parts of the barracks. The situation is made worse at night when the lights are off. The fact of having so many persons in such close proximity only makes it more likely that incidents will occur, making adequate supervision that much more essential while it also makes it more difficult. Although having a security officer in the hall between the barracks is a great improvement over the situation as same existed before the hearing (with no free-world security even in the area for long periods of time), it is not sufficient. Additional measures, above those already planned by the respondents as testified at the August 1981 hearing, are required.

It should be noted also that the respondents' assertions that they cannot reduce the population in the barracks because they do not have enough additional beds elsewhere in the institution to accommodate the inmates that would be displaced are not a sufficient response to the problem. The Court is not unaware of the limited resources of the respondents; however, limited resources cannot be considered an excuse for not maintaining the institution according to at least minimum constitutional standards. If the State requires that certain persons be institutionalized, as it may, it has the corresponding obligation to meet their basic human needs, which includes some degree of protection, where necessary, from other persons that the State also requires to live in the institution. The goal of the Court in allowing flexibility to the respondents in how they meet these needs is to permit them to use the resources they have in the way they deem the most efficient and most desirable. But the obligation to meet those minimum standards in some way is unchanging.

The Court has concluded that resolution of this issue should remain open to allow the respondents another opportunity to devise a solution to the problems of security and safety in the open barracks. In the response filed on December 28, 1981, the respondents mentioned that as an experiment in Barracks 8 all double bunks had been removed. The respondents reported that the same number of inmates are housed in the barracks as were housed there before, but no details concerning the actual arrangement of the bunks was given. The results of the experiment were described as follows:

> [T]he elimination of double bunks has been well received by both inmates and officers. The technique has, quite frankly, been more helpful than was anticipated. A number of problems have decreased, most notably the hanging of sheets from the top bunk to hide activity of whatever nature from view. As problems decrease, so do tensions.

However, despite this promising report on a potential solution to the problem, the respondents did not provide the details to the Court of exactly what the "experiment" required, suggest it as an alternative for use in other barracks, or explain why the bunks in other barracks should not be similarly eliminated. In fact, it is not known to the Court if the "experiment" in Barracks 8 was temporary and the beds have again been stacked, or if the respondents considered it suitable to leave the beds at one level in that barracks. The potential of such a solution to the problem, however, restores the hesitancy of the Court to simply require that the population in the various barracks in question be reduced by a specific number. It is the desire of the Court to allow the respondents to develop a solution to the problem that is most acceptable to them, if that is possible.

Therefore, the Court will again direct that within 30 days of the date of this Order the respondents provide to the Court proposals that it would favor as methods of resolving the inmate safety problem in the open barracks at the Cummins Unit. The Court's Order of December 1, 1981, together with the discussion of that order herein, should serve as a guide to the respondents. This problem must be dealt with despite the additional security arrangements that have been placed in effect by respondents. The petitioners will then have an opportunity to respond to the report by the respondents.

A hearing will be scheduled promptly thereafter, if necessary, to determine a final solution to the problem.

Another issue as to which a final solution cannot be ordered at this time is the provision for the full integration of the East Building and Barracks 14 and 16 at the Cummins Unit. As was discussed at the oral arguments following the August 1981 hearing, the level of racial integration of the institutions of the Department has been greatly increased since this litigation was commenced, and has been the subject of many prior discussions and orders by the Court. At present the Court finds that the institutions are satisfactorily integrated, except for the above named areas at the Cummins Unit.

The segregation in the East Building and Barracks 14 and 16 has been allowed by the respondents on the basis that such segregation was required to minimize the possibilities of violence at the institution. However, the allowance of segregation has been much broader than would, in the Court's opinion, be necessary to protect the safety of the inmates. Previous orders of the Court have recognized that there could be potential danger in individual situations in integrating two-person cells. The inmates at the Cummins Unit are convicted felons, and the possibility of violence cannot be dismissed lightly. It has been because of this possibility of violence that the Department of Correction has avoided integrating two-person cells in the maximum security units. However, as early as 1973 the Court made the following observations and order:

> The Court finds that as of now the populations of both institutions are fully desegregated, except that inmates of the maximum security unit at Cummins are still assigned to racially segregated cells. Desegregation of the barracks has been accomplished without the creation of any problems in the areas of security and discipline, and the Court cannot accept the argument put forward by respondents that members of both races cannot dwell peaceably together in the cells in the maximum security unit. And it should be pointed out in this connection that not all of the inmates of the unit have been put there for disciplinary reasons.
>
> This is not to say, of course, that there may not be some inmates, whether white or black, who cannot safely be confined in a cell with a member or members of the other race. In such cases the Constitution does not require assignment to integrated cells ... But the existing general policy of racial segregation in the maximum security cells cannot be approved and must be brought to an end.
>
> Respondents will be directed forthwith to consider the situations of all inmates now in the unit and determine on an individual basis which of those inmates, if any, cannot safely be put in a cell with a member of the other race. The rest of the inmates presently confined in the unit are to be assigned to cells on a non-racial basis.
>
> No present or future inmate of the unit is to be assigned to a cell on the basis of race unless the Superintendent of the institution personally finds in writing and with a statement of supporting reasons that the inmate in question should not be confined in an integrated cell; such finding is to be made a part of the inmate's prison record.

*Holt v. Hutto*, 363 F.Supp. 194, 203–204 (1973) (footnote and citations omitted). Thereafter, the respondents were permanently enjoined from assigning inmates of the maximum security unit to racially segregated cells, except under the narrow limits authorized by the above quoted language. Order of August 13, 1973, at p. 1.

However, the respondents have not yet actually integrated the cells of the maximum security unit. The respondents did develop a questionnaire that is answered by all inmates upon entering the East Building. Respondents' exhibit 81–37. The integration questionnaire simply asks the inmate to indicate if he does or does not "have objections to being integrated in the East Building." Space is then provided to allow the inmate to indicate what his objec-

tions, if any, are. On the basis of responses on this questionnaire, the respondents have said that integration is not possible. However, the questionnaire seeks what amounts to a statement of preference. The focus is not on the real issue of when an inmate's safety might be involved. The form definitely creates the situation where, if the inmate says the right thing, he can avoid having a person of a different race in the cell with him. This does not meet the limited criteria set forth in the Court's earlier opinion, as quoted above.

■ The policy has been clearly stated and is still correct. Racial segregation cannot be allowed to continue. The attitude of the Department in general, and of the superior officers, seems to be consistent with that policy. However, the procedures employed have not accomplished that result in the East Building and Barracks 14 and 16. A better approach for identifying the few cases where safety is actually involved must be found. For those individuals as to which violence is a real threat, if celled with an individual of a different race, segregation for that reason is acceptable. The method devised for identifying such persons must be no broader than is necessary to accomplish that goal.

The respondents shall suggest to the Court within 30 days of this date proposals for accomplishing integration of the East Building and Barracks 14 and 16 of the Cummins Unit. A reasonable transition period to accomplish this integration shall be allowed. If the respondents contend that there are real hazards posed by integrating some individuals, the proposal should suggest as precise a method as possible for identifying those individuals. The petitioners will then be given an opportunity to respond to the proposal by the respondents, and a hearing will be scheduled promptly if necessary.

As to the final two matters of which the Court has found the respondents not to be in compliance, the use of racial slurs and the affirmative action program, the problem does not lie with the policy of the Department, but rather with the success of the Department in accomplishing the goals they have set. The Court does not doubt that the respondents have made efforts to attract black persons into upper level position and to stop the use of racial remarks by officers in speaking to and about inmates. However, the evidence was clear that the efforts have not been wholly successful in accomplishing those results.

■ The issue of the use of abusive language toward inmates has been the subject of several prior orders of the Court. *See, e.g., Holt v. Hutto,* 363 F.Supp. 194, 214 (1973); *Finney v. Hutto,* 410 F.Supp. 251, 272 (1976). The Consent Decree provides that no Department of Correction employee is to "verbally abuse, curse, or use racial slurs when addressing or talking with inmates." The Court is not now concerned with cursing in general by officers. The Court also is not concerned with language used by inmates. Although higher level officers should continue to discourage cursing, in efforts to promote the professionalism of the Department and the officers, it would not be realistic to hope to "sanitize" the language used in such an environment. However, the use of racial slurs toward inmates cannot be tolerated to any degree. The prior orders of the Court have been very explicit in this regard.

The problem has not been resolved, in the opinion of the Court, because the upper echelon personnel have not taken a sufficiently forceful position on the issue. It does not appear that the very high ranking officers actually use such language themselves. Also the written policies of the Department prohibit the use of racial slurs in addressing inmates, and this prohibition is most probably pointed out to newly hired officers during training. However, this warning accomplishes little when, as apparently has frequently been the case, the new officer goes to work and the low and mid-level officers then provide the example of the use of such language. Although there was some evidence that persons using racial epithets toward inmates have on occasion been reprimanded, there was also evidence from high level employees, including the

Warden, that they knew such language was being used but passed it off as local custom. It is not a local custom, or a local problem; it is a national problem. The use of racial slurs in speaking to inmates is a direct violation of the orders of this Court, and such a violation of the law cannot be tolerated by supervisory personnel for any reason. The respondents must see that the use of racial slurs in addressing inmates is no longer allowed to continue at any level. It must be understood down the line of all supervisory personnel and correctional officers that not using such language in speaking to or about inmates is a condition of employment.

The implementation of the affirmative action program is a more complex issue with which to deal.[7] This is not an employment discrimination case where the court is interested in testing, and remedying if necessary, possible discrimination against blacks by the respondents in their hiring practices. The reason the affirmative action program is so important is not to benefit potential employees of the Department, although they are indirectly benefited. Rather, the importance is in obtaining a racial mix of the security personnel in order to alleviate feelings by black inmates, which are approximately half of the inmate population, that they are being discriminated against. The primary effort must be to hire qualified blacks and place them in positions of authority in all aspects of prison life.

The evidence demonstrated that the respondents have increased their efforts to recruit qualified black persons to work within the Department. Those efforts have been successful to the extent that blacks are well represented among the highest and the lowest ranking officers. In fact, it was shown that at the time of the hearing 53 percent of the correctional officers, the lowest level officers, were black. However, there have not been, and still are not, blacks in the middle management positions in significant numbers. This situation must be carefully monitored by respondents.

As discussed on the record during the oral arguments, the Court credits the testimony of Mr. Housewright that sincere efforts have been made to recruit blacks into middle positions, but such efforts have not been very successful. Several factors may be cited as contributing to that failure, the principal ones being an inability to pay competitive salaries and the rural location of the prisons. However, this failure cannot be used as an excuse for not continuing diligent efforts to recruit blacks who are already experienced in corrections work, and who could join the department at a middle or high level position. Recent improvements in the administration of the institutions and the working conditions for the officers, as discussed herein, should help to make the Department a more attractive place to work, and thereby aid in recruiting experienced personnel.

Furthermore, the respondents must intensify efforts to identify black correctional officers who are employed by the Department without prior correctional experience, but demonstrate potential that would qualify them for promotion within the Department. Efforts must be made to train such persons and promote them at a rate commensurate with their abilities, so that blacks will be better represented in the middle officer positions. The testimony was that the respondents have made efforts to train and promote from within, but have not achieved the success desired for various

---

7. The plaintiffs attempted to raise as part of this issue possible discrimination by the respondents against blacks, both inmates and free-world personnel, in job assignment and benefits of employment. The particular questions raised concerned the allegations that black officers rarely live on the "free line" and that "houseboys" for persons living on the free line are almost always black inmates. As noted on the record during the oral arguments following the August 1981 hearing, the Court does not perceive these as major issues in the case, and was not provided with sufficient evidence upon which to decide if the allegations of racial discrimination on these points are well taken. The Department was admonished only to avoid actual discrimination, of course, and also to avoid appearances of discrimination through stereotypes if possible.

reasons. However, the Court finds it difficult to understand, with a pool of black persons for potential advancement as high as 50 percent of the relevant work force, why greater efforts at selection and training would not result in promotion and retention of a greater number of blacks.

A certain rigid percentage of black officers will not be established as a requirement for compliance. However, the respondents must know that blacks, as previously ordered, must be employed in reasonable numbers at *all* levels of free-world personnel.

## VI

It is the conclusion of the Court that a third party should not be appointed as a "monitor" to oversee the operations of the Arkansas Department of Correction as had been requested by the plaintiff class. The parties are well aware of the efforts by this Court to avoid court appointment of a monitor throughout the history of this litigation.[8] Such court involvement in the daily administration of the institutions should be undertaken only if absolutely necessary. The progress made by the respondents through their own efforts without a court-appointed monitor leads to the conclusion that no person need be now appointed to oversee the operation of the Department through the time of the final report by the respondents that is contemplated by the Court, as discussed herein.

The respondents will be required to file periodic reports on the progress being made in various areas in the next several months and a final report on all outstanding issues during the week of May 3, 1982, as dis-

cussed above. These reports shall be comprehensive, specific, and factual. Copies of the reports shall be served upon counsel for the plaintiff class at the time they are filed.

It is expected that counsel for the plaintiff class will require both financial assistance and additional personnel during the time period allowed for review of the respondents' final report. As discussed above, the attorney for the plaintiffs is to file any objections or exceptions he might have to the final report of the respondents on or before June 14, 1982. Some investigation and review of the facts presented by the respondents will be necessary in order to make such objections.

The parties shall jointly determine how the investigation and review by the plaintiffs contemplated by the schedule established by the Court shall be conducted. The primary financial obligation shall necessarily fall upon the respondents. After consultation with the respondents, counsel for the plaintiff class shall propose, on or before March 29, 1982, a plan for who shall conduct the investigation and review and what resources will be necessary. The respondents shall then notify the Court in writing on or before April 9, 1982, whether they agree with the proposal by the plaintiffs. If the respondents do not agree with the proposal by the plaintiffs, they shall state with specificity their objections thereto, and suggest to the Court an alternative proposal. The Court will thereafter enter an order resolving the issue, if necessary.

## CONCLUSION

The findings of the Court during the August 1981 hearing, as reflected on the record and discussed herein,[9] demonstrate

---

**8.** The parties agreed in the Consent Decree entered on October 5, 1978, that a person should be employed as Compliance Coordinator for the Arkansas Department of Correction, and Mr. Stephen LaPlante was so hired. The position of Compliance Coordinator was not created upon the order or suggestion of the Court, and the Court did not designate or appoint the person to serve in that position. Mr. LaPlante was selected jointly by the Commissioner of Correction, the Attorney General, and counsel for the plaintiffs, and his salary was paid by the respondents, as agreed upon in the

Consent Decree. The powers and duties of the Compliance Coordinator were those agreed upon by the parties and set forth in the Consent Decree, and were not established by the Court.

**9.** It merits repeating that this Memorandum Opinion is not intended to be a comprehensive statement of the Court's findings concerning the various issues raised during the August 1981 hearing. Most of the Court's findings were made on the record during the course of that hearing, principally during the oral argu-

that the respondents have made great progress in improving conditions for inmates of the Arkansas Department of Correction. However, more progress must be made before this case can be dismissed. Vigilance by the respondents is required to assure, in areas in which the policies of the Department were found to be in compliance with the applicable standards, such as on the issue of excessive force, that those policies are actually practiced and followed by personnel at all levels. If a policy or regulation of the Department is constantly ignored, the effect is the same as if there were no such policy. Equal diligence will be required to put into effect various practices and policies, approved by the Court, in the way and according to the timetable that was presented to the Court. The findings of compliance are conditional upon the proper effectuation of the various programs. Therefore, the respondents must continue directly on the path they have charted to achieve success.

ments held at the conclusion of the hearing. This Memorandum Opinion was intended to restate and discuss, perhaps adding greater elaboration, the findings of the Court stated on the record. Although in the case of conflict this written memorandum should be considered controlling, the findings and orders made orally from the bench are equally binding as those contained in this Memorandum Opinion in those instances where there is no conflict.