Robert FINNEY, et al., Petitioners,

v.

James MABRY, et al., Respondents.

No. PB–C–69–24.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Aug. 20, 1982.

Philip E. Kaplan, Jack Holt, Jr., Phillip McMath, Little Rock, Ark., for petitioners.

Steve Clark, Atty. Gen., Albert Carter Hardage, Asst. Atty. Gen., State of Ark., Little Rock, Ark., for respondents.

## ORDER

EISELE, Chief Judge.

It now appears that after a long, and at times turbulent, history this case is ready for final disposition. The original complaint was filed in April 1969. The case has proceeded as a class action on behalf of all inmates of the Arkansas Department of Correction for the purpose of challenging the constitutionality of the conditions of confinement at the various units of the Department. Relatively early in the history of the case the Court determined that many conditions of confinement imposed by the respondents were unconstitutional. Efforts since that time have been directed toward improving the situation at the prison units to an acceptable level so that the case could be dismissed. Several hearings have been held to assess the progress being made. Numerous orders have been entered determining the rights of the parties and

imposing specific requirements on the respondents in the operation of the Department of Correction. In addition, and most significantly, the parties voluntarily and as a result of their initiatives entered a Consent Decree in October 1978 in which the respondents agreed to meet certain minimum standards in the operation of the Department of Correction in accordance with a stipulated time schedule. Difficulties developed in meeting the schedule. Upon request of the plaintiff class, a hearing was held in August 1981 to determine the extent of compliance by the respondents with the Constitution, the Consent Decree and the prior orders of the Court. Following that hearing, and arguments by counsel, the Court made detailed findings concerning conditions at the prisons, and concluded that the performance of the respondents on a significant number of issues was sufficient to allow a finding of compliance; that in other areas the respondents would be found to be in compliance if certain procedures or facilities were implemented and provided as had been represented to the Court; and that on other issues the policies and practices of the respondents did not yet comply with the requirements of the Constitution, the Consent Decree, and the prior orders of the Court. A Memorandum Opinion was issued setting forth these findings and conclusions on February 19, 1982, 534 F.Supp. 1026, and an Order was entered on March 2, 1982, 546 F.Supp. 626, imposing additional requirements on the respondents. Pursuant to that Order, periodic reports were submitted to the Court by the respondents describing their progress in implementing the various changes in facilities and procedures which had either been represented to the Court during the August 1981 hearing as projected or adopted, or had been required by the Court following the hearing. A final report on compliance was filed by the respondents on May 7, 1982.

It was, and is, the position of the respondents, as argued in the final report, that the requirements of the Constitution, the Consent Decree and all prior orders in this case have been complied with in all respects, and that the case should therefore be dismissed.

The petitioners filed certain exceptions and objections to the final report, drawing into issue the conclusion stated therein that the Arkansas Department of Correction was in full compliance.

A short hearing was held on Monday, August 9, 1982, to hear evidence and arguments concerning the disputed issues in the case. At the end of that proceeding, the Court concluded, on the record, that the respondents were in compliance with the Consent Decree, the Constitution, and all prior orders of the Court. For the reasons stated on the record at that time, as explained and supplemented herein, it is with great satisfaction that the Court now concludes that jurisdiction over the Department of Correction must be finally relinquished and this case dismissed.

The dispute between the parties has been narrowed during the recent course of litigation to a few specific issues. As to many issues that were disputed up to the time of the final hearing, the petitioners have now agreed that the respondents are in compliance. For other issues, the dispute between the parties involves questions of law rather than questions of fact, and those matters are resolved by the Court herein. Each of the outstanding issues will be discussed independently.

■ As to certain matters, including the evaluation of transfers from the Tucker to the Cummins Unit; the provision of notary service for inmates; the maintenance of sanitation standards at the Cummins Unit, particularly the maximum security facility of that Unit; and the classification system, the Court determined at the conclusion of the hearing in August 1981 that the policies or practices of the respondents, either in effect at that time or planned to be put in effect in the very near future, would meet the requirements of the Constitution, the Consent Decree, and prior orders of the Court. As to these issues, the Court concluded that a final finding of compliance could not be entered at that time only because the particular policy or practice in question was very new, and in some in-

stances not fully implemented, so that the actual effects of the changed practice, or the ability of the respondents to carry it out as planned, could not be adequately measured. Therefore, for these matters it was ordered that the practices of the respondents would be monitored for a period of time before a final decision concerning compliance would be made. The period for such monitoring ended with the submission of the final report by the respondents. As to each of these matters the petitioners have now agreed that the conduct of the respondents has remained satisfactory, and that a final finding of compliance may now be made. Therefore, no further inquiry is required, and the Court concludes that the respondents have conformed their practices in these areas to that represented to the Court during the August 1981 hearing, and are in compliance.

■ The Court also found in the February 1982 Memorandum Opinion that the respondents would be in compliance on the issues of an adequate grievance procedure for inmates and the provision of medical services for inmates if the programs that had been adopted shortly before and during the August 1981 hearing were implemented as planned. Again, the programs for the provision of these very important services were too new at that time to allow an evaluation of their effectiveness in actual practice. Therefore, it was required that the programs be monitored for a period of time, and also that the respondents submit reports to the Court and to the attorney for the plaintiff class at stated times describing progress made in implementing the new programs and evaluating their effectiveness. Such reports were made, and the petitioners have now agreed that the reports are accurate and that the programs as implemented meet the requirements of the Constitution, the Consent Decree, and prior orders of the Court. Indeed, the progress made in these two areas is exceptional. The medical services contract has met all expectations concerning its effectiveness and will very likely serve as a model for use in other institutional settings throughout the nation. For many years the Depart-

ment of Correction had attempted to provide necessary medical services for inmates "in-house." However, the high cost of necessary basic medical supplies and equipment and difficulty in attracting qualified professionals to adequately staff the service made their efforts less than successful. The respondents have now contracted with a private company to provide essential medical services, and the results have proven that the decision to do so was well taken. The numbers of qualified trained medical personnel available and attending to the medical needs of the inmates have increased dramatically. Services are now being provided in a professional and efficient manner. Even the attorney for the petitioners praised the medical services program and its apparent success. Similarly, the grievance procedure has been administered professionally by the Department of Correction, and appears to have accomplished the desired result. The data collected by the respondents and provided to the Court in their periodic and final reports indicates that the grievance procedure continues to be well used by the inmates and that the planned time limitations for resolving grievances filed have been adhered to by ADC personnel. Based upon the reports submitted by the respondents, and the agreement thereto by the petitioners, the Court finds that the respondents are in compliance with the Constitution, the Consent Decree, and all prior orders of the Court on all matters concerning the provision of adequate medical services and a proper grievance procedure for the inmates of the Arkansas Department of Correction.

■ Following the hearing in August 1981, the Court ordered that, if the respondents continued to operate in the manner that had been represented to the Court during the course of that hearing and adopted a record-keeping requirement then imposed by the Court, they would be found to be in compliance with the requirements of the Constitution, the Consent Decree, and all prior orders of the Court on the issue of repair of damages in the East Building of the Cummins Unit. The re-

ports of the respondents that these requirements have been met have not been contested by the petitioners. Therefore, the Court finds that necessary repairs in the East Building have been completed in an orderly and timely fashion as needed, and that the "paper chase" described by the Court in the Memorandum of February 19, 1982, and required to be implemented by the Order of March 2, 1982, has been adopted and maintained, and concludes that the respondents are in full compliance on this issue.

The Court concluded in the Memorandum Opinion filed February 19, 1982, that the plan that had been adopted by the respondents for the rotation of officers through the East Building of the Cummins Unit, as had been required by the Consent Decree, would be adequate if followed in practice the way it had been represented to the Court during the August 1981 hearing. The Court required only that continued compliance be monitored for a time before the Department was actually released on this issue. The final report of the respondents indicates that the plan for officer rotation has been implemented as had been planned, and the petitioners agree that this is so. In the final report, however, the respondents also indicated an intention to modify the plan to allow that officers be rotated out of the maximum security unit after a year rather than six months as had been the previous rule, if such an extension were agreeable to the particular officer involved. It is anticipated that allowing some officers to remain in the East Building for a year, rather than six months, will increase the experience and expertise of the officers working in that building at any given time and reduce the amount of time required to train officers in East Building operations. The petitioners objected to this modification as stated, and argued that an officer should not be retained in such a stressful position as guard in the East Building for a period longer than six months unless the officer were required to submit to periodic psychological evaluations and unless other safeguards were devised which would guard against the possibilities

of "burn-out" and possible resulting abuse of inmates. The concern of the petitioners is reasonable. However, the Court has concluded that the modification is acceptable as represented by the respondents, because it adequately guards against such problems, and that the required testing suggested by the petitioners is not required to safeguard against potential reactions by guards to the stress of working in the East Building. The Supervisor of the East Building periodically conducts performance evaluations of the officers working in the East Building, and in that evaluation notes any evidence of stress exhibited by the officer. The respondents have further represented to the Court that officers who are assigned to the East Building are rotated among the various wings of the building at 30 day intervals, that any officer who requests a transfer from the East Building is transferred, and that no officer is to be retained in the East Building for more than one year. Under these circumstances, it appears that adequate mechanisms to recognize and alleviate any situations that might arise due to the stressful conditions of employment in the maximum security unit are contained in the plan as represented by the respondents, and that further measures, as suggested by the petitioners, are unnecessary. The Court, therefore, approves the plan for rotation of officers in the East Building, including the proposed modification of that plan which would allow rotation on an annual rather than bi-annual basis, and concludes that the respondents are in compliance with the requirements of the Consent Decree on this issue.

The parties also disagreed on the standards to be applied and the evidence to be relied upon in the evaluation and reevaluation of inmates of the East Building, particularly those held in administrative segregation. Following the August 1981 hearing, the Court concluded that it appeared that the respondents were basically in compliance on that issue, but ordered that the evaluation program should be monitored for a period of time, and also required that more complete records concern-

ing the evaluations should be maintained. Specifically, the Court ordered that a written record be prepared in each case documenting what the evaluation consisted of and indicating the reasons that were relied upon to justify keeping the person in the maximum security unit or transferring him out. It was also required that the record reflect any psychological counseling or testing conducted or other reference, and the results thereof, and that if no such reference was felt to be necessary, the reason for that conclusion. The respondents reported in the final report on compliance filed May 7, 1982, that the reviews were being conducted in a timely fashion and that the reporting form had been modified so that the information required by the Court was now to be supplied on the form. The report further indicated that steps had been taken to educate the review committee on the proper use of the form and appropriate criteria for consideration in reaching their decisions. The petitioners objected to the report of the respondents concerning evaluation of inmates on administrative segregation on several grounds. First, the petitioners argued that psychological reports should be prepared on all inmates in administrative segregation, rather than only on those inmates who voluntarily submit to the testing required to prepare those reports. The petitioners also objected to the stated attitude by the evaluation committee to give preference to knowledge concerning security risks perceived from the behavior of a particular inmate over information contained in a psychological report. The petitioners also made the allegation that responses provided by the committee on the evaluation forms were "superficial," but offered no evidence in support of this allegation. The petitioners did not allege that the respondents were not conducting the evaluations in the time and manner that had been represented in the final report, or that the additional reporting requirement imposed by the Court had not been adopted or implemented as required. The Court has concluded that a finding of compliance may be made despite the objections of the petitioners. Actually, the accomplishments of the respondents in this regard are commendable. By increasing the frequency of the meetings of the review committee and demonstrating efforts to make the evaluation as thorough, meaningful and fair as possible, the respondents have actually gone beyond what was required by the last orders of the Court concerning this issue. To force inmates to submit to psychological evaluation would be counterproductive and wasteful of time and resources. Data obtained under such circumstances would be very questionable. Furthermore, making the final decision on housing an inmate based upon security considerations which are felt to override information contained in a psychological profile on the inmate is acceptable in the opinion of the Court. The evaluation committee is required to consider any information available concerning the psychological condition of the inmate or any such information reasonably obtainable which would be helpful in reaching a just decision. However, the committee members are not required to substitute the judgment of the mental health staff for their own judgment, and are free to come to a conclusion contrary to that stated in any psychological report. In a correctional institution security must be considered central to all other goals. Of course, to arbitrarily ignore psychological reports would defeat the requirement that such reports be prepared and be considered. However, the Court will not require that the reports be given any specific weight in the face of known behavior of the inmate. The ultimate decision must be left to the persons charged by the institution with the responsibility for such evaluations who must act in good faith, considering all appropriate criteria. The decision of the committee, and the basis for that decision, must be recorded by the committee in a meaningful way in accordance with standards previously established by the Court. There is no evidence before the Court that would indicate that the committee has not been operating in conformity with these requirements. Therefore, the Court has concluded that the respondents are in full compliance with the requirements of the Constitution, the Con-

sent Decree, and all prior orders of the Court on the issue of evaluation and re-evaluation of residents of the East Building of the Cummins Unit.

The procedure utilized by the Department of Correction for the discipline of inmates is another area where the dispute between the parties has narrowed to questions of law rather than fact. During the hearing in August 1981, the evidence indicated that the policy concerning disciplinary procedure in effect for the Department and the forms used in conjunction with disciplinary proceedings had been recently amended, in some instances as recently as during the course of the hearing. The Court ordered that a recording requirement be added so that before an inmate who alleged a medical justification for refusal to work could be disciplined for malingering, a written record had to be made which identified the person at the infirmary who provided the information that the inmate had not been given an excusal from work for medical reasons. This was the only change required by the Court in the policy, forms, or procedure as same had been represented to the Court as then recently adopted. It was concluded that the disciplinary procedure would be monitored for a time, and then if it had been implemented as planned, a final finding of compliance would be made. No factual allegations have been made that the respondents have not followed the stated policy. Rather, the objections of the petitioners are challenges to the policy itself.

The respondents have proposed that the time limitation for the hearing of disciplinary charges be extended. The present policy requires that all disciplinaries be heard within 72 hours, excluding weekends and holidays. The proposed modification of the rule would allow that disciplinaries would not have to be dismissed unless not heard within five days in certain circumstances. The proposed rule:

The Major Disciplinary Committee is expected to convene for a hearing within 3 days (excluding weekends and holidays) after the occurrence of the disciplinary episode. The Disciplinary Committee's objective shall be to try all disciplinary actions within 3 days of the occurrence of the incident. However, a disciplinary action will not be reversed for procedural error on grounds of not receiving a timely hearing so long as the hearing is conducted within 5 days (excluding weekends and holidays) of the disciplinary episode. No disciplinary will be heard after 5 days from the time of the infraction except pursuant to a valid extension.

The idea of extending the "72 hour rule" was first suggested by the respondents during the oral arguments held in September 1981 following the August hearing. At that time the Court stated on the record that it was of the opinion that disciplinary charges should not have to be dismissed by the Department simply because they could not be timely heard due to the large number of such charges, despite diligent efforts to hear all disciplinaries within the allotted time, and therefore indicated that an extension was a reasonable proposal and would be considered. The attorney for the petitioners agreed at that time that an allowance for an extension to avoid this problem would be agreeable. However, the petitioners now argue that the rule change proposed would allow a blanket extension to five days in all cases, rather than in only those cases where it is necessary. The respondents argue that such a construction would be contrary to what is stated in the rule, and the Court agrees. The rule, as proposed, specifically states that the Disciplinary Committee is "expected" to hear all disciplinary charges within three days and that such is to be the "objective" of the Committee. The good faith of the Committee in operating according to the stated disciplinary policy must be assumed. To require a formal extension in each case would simply add greater paperwork. The proposed change in the rule is reasonable and adequately protects the interests of the inmates in having all charges heard promptly. Therefore, the proposed modification is approved by the Court and will not prevent a finding that the disciplinary procedures of the Department of Correction are in compliance with the Constitution, the Consent Decree, and all prior orders of the Court.

The other objection by the petitioners to the newly adopted disciplinary policy concerned that portion of the policy which allows extensions of time before a hearing on a charge in certain circumstances. One provision states that extensions may be granted by the Warden if "the case requires more extensive investigation." The petitioners argue that this language is overly broad and vague and would allow for great abuse. No evidence of actual abuse was alleged or proven. The Court agrees that the potential for abuse is present here as in other areas. However, as stated before, the good faith of the respondents, and the Warden's granting the extensions for hearings, must be assumed. The policy as stated is reasonable and acceptable, and does not violate the applicable standards. The potential for misuse of the policy cannot be dealt with in hypothetical terms and cannot be held to prohibit a finding that the policy itself complies with the requirements of the Constitution, the Consent Decree, and the prior orders of the Court.

As to three areas, the provision of mental health services, the use of inmates in security positions, and the staffing levels of free world personnel at the prison units, particularly the Cummins and Tucker Units, the Court found, following the 1981 hearings, that although the prior practices of the respondents had been inadequate, the respondents had presented to the Court newly adopted changes in those practices which, if implemented, would be acceptable. For each issue the Court specifically ordered that the respondents were not to revert to the practice that had been in place prior to the August 1981 hearings, but no formal period for monitoring or reporting was actually imposed. The question now before the Court, therefore, as raised by the petitioners, is whether the respondents have complied with the orders of the Court to end the prior practices, and whether the new practices in each area have been implemented as planned and are adequate.

The respondents have been somewhat reluctant through the earlier course of this litigation to recognize the importance of providing mental health services for certain inmates. However, progress demonstrated both in the evidence presented at the August 1981 hearing and in the final report of the respondents filed May 7, 1982, shows that the respondents have now realized the necessity of providing such services and have fully accepted the responsibility for doing so. This capability is a key ingredient in a proper classification program and in establishing a system to protect both inmates and employees from inmates who are dangerous to themselves or others, or who themselves might be "victims" because of their mental condition, or who simply are mentally ill and in need of medical treatment.

When this litigation was commenced, no mental health services were provided for inmates. During the course of litigation, the level of services provided has gradually increased. At the August 1981 hearing the respondents presented evidence indicating that a separate facility for the treatment of the most severely mentally ill inmates had been opened and was operational at the Diagnostic Unit as a temporary measure, and that a permanent facility for the custody and treatment of such inmates was planned. The Court specifically found that prior to the opening of this interim unit the level of mental health services provided by the Department was clearly inadequate, and ordered that from that point forward the respondents be required to "keep and maintain at all times a separate facility on a permanent basis for the housing and treatment of severely mentally disturbed inmates." Order filed March 2, 1982, 546 F.Supp. at 626.

The final report of the respondents indicates that the requirements of the Court for the provision of mental health services have not only been met, but that plans are in progress to improve the program to an even greater degree by adding additional services and an intermediate care unit within one of the barracks at the Cummins Unit, and possibly by expanding the size of the planned permanent facility. The petitioners originally objected that although the

interim facility at the Diagnostic Unit was open, it was inadequate to meet the needs of all those inmates who actually should be housed in such a separate facility, and that the treatment provided at the facility was deficient in several respects. These objections were withdrawn, however, and no evidence concerning the mental health services provided by the Department was presented by the petitioners at the August 9, 1982, proceeding. The Court finds, therefore, that the program for the provision of mental health services, as described by the respondents in their final report to the Court, which is uncontested by the petitioners, is adequate to meet the requirements of the Constitution, the Consent Decree, and the prior orders of the Court.

The use of inmates in security positions within the institution is another matter that has caused great problems throughout the long course of this litigation. As has been discussed in prior orders by the Court, at the time this action was commenced there were only a few free-world personnel employed by the Department of Correction, and almost all duties, including those of armed guards, were performed by inmate trustees. The practice of allowing some inmates to carry weapons was terminated some time ago. However, the evidence presented at the August 1981 hearing indicated that inmates were still employed in "turn-key" and "floor walker" positions in which they had power to exercise discretion over the movement and conditions of other inmates. The Court enjoined the continued employment of inmates in such positions except in serious emergency circumstances when no other alternative for control is available. Order filed March 2, 1982, 546 F.Supp. at 626. The final report of the respondents indicated that the use of inmates in such security positions had been phased out by the required date, and that inmates are no longer employed in positions allowing them to exercise the prohibited discretion. The respondents raised the question of whether the inmates working as unarmed guards in the towers at the Cummins and Tucker Units would violate the standard established by the Court. By a letter to the Court dated August 4, 1982, the attorney for the petitioner class agreed that the functions performed by the unarmed tower guards are within that allowed by the above stated standard. Although the petitioners had originally stated that they planned to present evidence in support of their allegation that some inmates had been given more than the acceptable amount of authority at night, they did not do so. The final report of the respondents indicates that inmates have been used only in positions as it was described they would be at the August 1981 hearing. There is nothing before the Court to indicate that this is not true. Since such use of inmates does not allow those inmates the power or discretion to control other inmates, it must be concluded that the injunction of the Court has been obeyed and that the respondents are now in compliance with the requirements of the Constitution, the Consent Decree, and all prior orders of the Court on the use of inmates in security positions.

There is no question at this time but that the respondents are in compliance on the issue of increased staffing by free-world security personnel. The Court specifically found in the Memorandum Opinion filed February 19, 1982, that the prior staffing levels had been inadequate. Although no specific staffing pattern was imposed, the Court determined that if the plan to increase staffing was implemented as represented to the Court during the August 1981 hearing, the staffing level would be adequate. The final report of the respondents indicates that the staffing pattern was implemented as planned, and the petitioners have not contested this conclusion. Therefore, the Court concludes that the staffing of the prison units with free-world security personnel is adequate to meet the requirements of the Constitution, the Consent Decree, and all prior orders of the Court. This is a significant and major achievement because it directly and indirectly affects the ability of respondents to meet constitutional standards in many other areas.

■ It should be noted that the petitioners had requested that the Court enter an injunction requiring the respondents to maintain funding for the Department of Correction at not less than the present level so that continuation of the several newly implemented programs, particularly the staffing pattern, would be guaranteed. The Court denied this request on the record at the August 1982 hearing. The respondents are well aware of their responsibility to maintain conditions at the various units of the Department of Correction at an acceptable level. There is no question but that doing this will require continued employment of an adequate number of free-world personnel to maintain adequate security. In the same way there is no question but that maintaining compliance will require that the units not become overcrowded again, and therefore some solution for housing the anticipated increase in the inmate population must be devised. Providing such personnel and housing will certainly require that funding for the Department of Correction not only be maintained at present levels but probably increased as the inmate population increases. However, enjoining continued funding at any specific level would not be appropriate. Also, as a matter of comity, it is the opinion of the Court that such an order should be avoided as an unnecessary intrusion into the affairs of the State. The duty and responsibility of the State to adequately fund the prison system so that conditions remain in compliance will persist, regardless of the continued pendency of this action. The requested injunction is unnecessary and would be unwise. It will therefore be denied.

As to the remaining issues discussed in the Memorandum Opinion filed February 19, 1982, the Court concluded that the progress made by the respondents up to the time of the August 1981 hearing, or the changes planned by them up to that time, were not sufficient to bring the respondents into compliance with the requirements of the Constitution, the Consent Decree, and prior orders of the Court. These issues included the procedural requirements and conditions for administrative segregation, security in the open barracks of the Cummins Unit, integration of the East Building of the Cummins Unit, use of racial slurs in addressing or in the presence of inmates, and affirmative action in the hiring and promotion of personnel. Although the results accomplished since that time in some of these areas is not as great as might be hoped, the efforts of the respondents have been great, and for each area the results have at least been sufficient to allow a finding by the Court of compliance with the Constitution, the Consent Decree, and all prior orders of the Court.

■ The progress of the respondents in stopping the use of racial slurs in the presence of inmates, as documented in the final report submitted to the Court, is highly commendable. As was discussed by the Court on the record following the August 1981 hearing and in the Memorandum Opinion filed February 19, 1982, the use of such language has been a grave problem that detracted greatly from both the professionalism of the staff and the morale of the institution. Although the Department had long had a policy forbidding such language in addressing inmates, the evidence at the August 1981 hearing demonstrated that the policy had been to a considerable extent ignored. Racial epithets were used by both upper and lower echelon officers, and even those who did not use such language themselves often tolerated its use by others in their presence. The situation has now changed. The various memoranda and other documents attached to the respondents' final report on this issue show that the respondents have undertaken both to educate all officers that the use of such abusive language while at the institution will not be tolerated and could lead to termination of employment, and to periodically remind the officers of the importance of avoiding such language. The efforts of the respondents have apparently been greatly rewarded in that it appears that the use of racial slurs by employees in the presence of inmates has stopped rather abruptly. The respondents' Compliance Attorney reported that even the Inmate Council of the Cummins Unit

agreed that the use of such language had been eliminated and was no longer a problem. A review of grievances filed since the institution of the grievance procedure also demonstrated that very few complained of the use of racial slurs. The petitioners stated in their Exceptions and Objections to the Final Report that they had no objections in this area and were satisfied with the report made to the Court by the respondents. The Court therefore accepts the final report of the respondents as true, and is very pleased with its contents. Based upon that report, it is concluded that the respondents are in compliance with the Constitution, the Consent Decree, and prior orders of the Court on the prohibition of the use of racial slurs in the presence of inmates.

■ The procedural requirements that must be followed before placing an inmate in administrative segregation and the conditions that can be imposed on inmates in administrative segregation were matters for which the Court also found that the policy and practices of the Department of Correction were inadequate. A Memorandum Opinion dealing only with these issues was filed by the Court on December 15, 1981. That Memorandum Opinion contained specific directives concerning what would be required to bring the Department of Correction into compliance on these issues. The final report of the respondents indicates that all such requirements have been met. The petitioners have stated they have no objections to that report. Therefore, the Court concludes that the respondents are in compliance with the requirements of the Constitution, the Consent Decree, and all prior orders of the Court on procedures applicable to placing an inmate in administrative segregation and on the conditions of confinement in administrative segregation.

■ The results obtained in attempts by the respondents to integrate the East Building have not been as great as was hoped or expected, but the Court has determined that the remaining segregation is not the result of any objectionable policy or practice by the respondents. As was discussed

at length in the Memorandum Opinion filed February 19, 1982, integration of the prison system has been a task to be accomplished during the entire course of this litigation. As of August 1981, the only portions remaining segregated were the East Building and Barracks 14 and 16 of the Cummins Unit. The parties agreed during a conference in chambers on March 25, 1982, that integration of Barracks 14 had been satisfactorily accomplished. However, integration of the East Building and Barracks 16 has remained a problem. The justification throughout the history of the case for the continued segregation of the inmates has been security. The areas of the institution that remain segregated are composed of two-man cells. The inmates housed in these areas are there either for punitive reasons, or because the administrators of the institution have perceived a security risk either for themselves or for others if they are housed in the general population. Therefore, threats of possible violence must be considered even more serious than if coming from an inmate in general population. However, the Court determined that the mechanism that had been employed by the respondents for screening to determine such possibilities of violence was much too broad. The Court ordered that:

> A better approach for identifying the few cases where safety is actually involved must be found. For those individuals as to which violence is a real threat, if celled with an individual of a different race, segregation for that reason is acceptable.

Memorandum Opinion filed February 19, 1982, at p. 1043. The respondents did devise a new plan, which was presented to the Court and the attorney for the petitioner class at a conference concerning the matter on March 25, 1982. The efforts of the respondents according to the new plan have achieved limited results in that the portions of the institution in question remain mostly segregated. However, there have been many threats of violence or retaliation for attempted integration and some episodes of actual violence. Although the respondents have estimated that there would be only

"limited to moderate violence of limited duration" if part of the cells were forcibly integrated, Response to Petitioners' Exception and Objections to the Respondents' Final Report, filed July 16, 1982, at p. 15, the Court is hesitant to order such action due to the risks involved. The procedure now employed by the respondents, with diligent efforts by the personnel involved to promote integration to the extent possible without actually forcing it, should eventually cure the problem. Pressure among the inmates, either actual or perceived, to avoid integration must be alleviated to the extent possible. The fact that the desired results will take some time to accomplish should not prohibit a finding of compliance. As was stated in the February 19, 1982 Opinion, the policy concerning integration has been established for some time and has been accepted by the Department. The procedure utilized to effectuate that policy is now more clearly directed at identifying those individual inmates who would indeed pose a bona fide threat to security or safety if required to cell with an inmate of another race. The policy and procedure of the Department to effectuate integration of the entire institution, and the attitude of the Department to achieve that goal as exhibited by the final report, are no longer objectionable. Therefore, the Court has concluded that the respondents are in compliance with the requirements of the Constitution, the Consent Decree, and all prior orders of the Court on the integration of the East Building and Barracks 16 of the Cummins Unit.

The affirmative action program for hiring and promoting women and minorities as free-world personnel, especially into mid-level management positions, is another area where the results accomplished have fallen somewhat short of expectations.[1] The efforts of the respondents have been greatly complicated by a hiring freeze in effect at the Department of Correction for part of the time since the last hearing in this case. The final report does indicate that some progress has been made. A special program, entitled the "Command Officers School" has just been started through which the Department plans to identify those lower level correctional officers, particularly blacks, who have demonstrated potential for advancement, and then to offer special training to those persons allowing them more rapid advancement. The Department has also created a new position in the Personnel Office with the responsibility to oversee compliance with the Department's Affirmative Action Plan. The respondents have stated in their pleadings their continued commitment to the Affirmative Action Program. It is the conclusion of the Court that the policy and attitude of the Department concerning the Affirmative Action Program, as reflected in the final report to the Court, are sufficient in the context of this case. A finding of full compliance on this issue is therefore warranted.

Another troublesome problem through this litigation has been overcrowding of the various facilities operated by the Department of Correction. As was noted in the Memorandum Opinion filed February 19, 1982, the problem of mere numbers of inmates has been resolved for some time. However, the greater security needs caused by crowded conditions have remained unsatisfied, particularly in the "open" or "100-man" barracks at the Cummins Unit. The recent increases in security staff at the unit have eased the situation somewhat, but have not been sufficient to solve the problem. The efforts of the Court have been to avoid imposing any specific solution which

---

1. It must be noted here, as it has been in prior orders of the Court, that the concern of the Court in this case is not with the rights of potential minority and female employees of the Department, but rather with the rights of the inmate class to have an appropriate racial and sexual mix in the administrators of the system, especially those involved with security. This difference in focus greatly affects the standard for evaluating the affirmative action program of the Department. The Court has been informed that a suit to vindicate the rights of employees and potential employees of the Department of Correction pursuant to Title VII of the Civil Rights Act, 42 U.S.C. 2000e, *et seq.*, has also been filed and is presently pending before the Honorable Oren Harris. *Jones v. Hutto,* No. PB–C–74–173.

could cause a hardship for the Department, but rather to allow the respondents as much flexibility as possible to devise a solution, either by reducing the population in the barracks or by increasing security to an adequate level through other means. The position of the respondents has consistently been that forcing a reduction in the population of the barracks would only cause greater problems elsewhere in the system because of lack of adequate housing for the inmates that would be displaced by the population reduction. The alternative solution now devised by the respondents is adequate to bring the security in those open barracks to an acceptable level without requiring a population reduction. All of the beds in the barracks are now at floor level. No stacked double bunk beds remain. In addition, greater emphasis has been placed on prohibiting inmates from hanging or draping sheets, blankets or laundry from their beds. The combination of these factors has greatly increased the visibility through the barracks from points on the sides and front of the barracks, and has reduced tensions among inmates. Furthermore, lighting in the barracks has been increased, particularly in the commissary and picket areas which are farthest from the hallway. In the past these areas have been very dark, making it difficult for an officer outside the barracks to observe movement or activity in the barracks during sleeping hours. It was during this time period that many episodes of alleged violence among inmates were reported. The new lighting plan requires that the lights in the picket and commissary areas be left on during the night so that each large barracks is backlit, making continual visual supervision possible. A group of specially trained officers are also employed to "shake down" the various barracks on a random basis in order to curtail contraband. Finally, in addition to the officers that are always present in the hallways for visual surveillance of each barracks, a patrol officer enters the barracks on a random basis, inspecting each one at least once an hour at irregular times. This officer actually walks through the barracks checking activity among the inmates as well as locks, lights, latrines and the temperature. The Court has determined that these measures, if continued as represented to the Court, are sufficient to provide adequate safety and inmate security in the open barracks despite the numbers of inmates now housed there. Therefore, no order requiring a reduction of the population in those barracks will be entered. If the respondents continue the security measures as represented to the Court, they will be in compliance with the requirements of the Constitution, the Consent Decree, and all prior orders of the Court on the issue of inmate safety and overcrowding in the open barracks.

The petitioners have also raised other issues which were not discussed in the final report of the respondents. These are the use of excessive physical force against inmates, the housing of homosexual inmates and protective custody inmates in one barracks, and a lack of plans to adequately deal with projected increases in inmate population.

 The parties agreed at the August 1981 hearing that the policy of the Department of Correction concerning the use of physical force in controlling inmates was acceptable and in compliance with the Constitution, the Consent Decree, and prior orders of the Court. The Department also has an established mechanism to investigate and resolve allegations by inmates of use of excessive force. The complaint of the petitioners at this time is that such allegations were not being investigated quickly enough and that the discipline meted out when excessive force was found was not strong enough to act as a deterrent against further such conduct by officers. The petitioners presented evidence concerning this allegation at the August 9, 1982, proceeding. The Court concluded on the record at that proceeding that the evidence produced would not justify a finding of non-compliance on this issue. It is undisputed that the policy of the Department prohibits the use of excessive force, and that that policy is enforced. No pattern or practice of excessive force was demonstrated. At most an isolat-

ed incident was proven.[2] Although any such abuse is not to be condoned, such isolated occurrences are not the proper subject for relief in this class action. It is probable, almost inevitable, that in the situation of any correctional institution occasional complaints of excessive force or abuse will arise. The individual inmates making such complaints retain their rights under 42 U.S.C. § 1983 as well as other possible remedies. There is no evidence before the Court which would indicate that the class of all inmates would be entitled to relief on the basis of a claim of excessive force. The policy and practice of the respondents are in compliance with the requirements of the Constitution, the Consent Decree, and prior orders of the Court, and therefore they may be dismissed on this issue despite the fact that individual allegations of excessive force still are made periodically, and are likely to be made in the future.

▆ The housing plans for inmates is an administrative decision, and the plan for housing both homosexual and protective custody inmates in a single barracks does not violate the requirements of the Constitution or any prior order of the Court. Although the petitioners or the Court could disagree with the plan of grouping inmates in such a way, it is a matter of correctional policy within the discretion of the administrators of the institution. The petitioners have not demonstrated that the policy or plan has caused the violation of the rights of any inmate. Therefore, the allegation will not be held to require a finding of non-compliance.

▆ Finally, speculation concerning projected increases in inmate population would not justify a finding by the Court that the respondents are not in compliance. The evidence presented in the August 1981 hearing shows both that the respondents agree with the petitioners that the populations of the Department of Correction are

likely to increase greatly over the next few years and that plans are underway to meet the greater burdens placed on the Department by the increased population. To judge the plans as compared to the projected population increases at this time would be premature and based upon speculation. To enjoin a minimum level of funding for the Department would also be unwise for the reasons discussed earlier. As has been previously stated, the respondents are well aware of their obligation to maintain conditions at the various units of the Department of Correction at a constitutional and lawful level. This obligation will not end with the dismissal of this suit, but rather will continue for as long as the Department of Correction is in operation. A similar suit could be filed tomorrow if the conditions are not so maintained or if there is a reversion to prior unacceptable policies and practices. Therefore, the projected population increases will not cause a finding of non-compliance at this time.

The conclusion of the Court is, therefore, that the respondents are in compliance with the requirements of the Constitution, the Consent Decree, and all prior orders of the Court on all issues concerning the conditions of confinement at the various units of the Arkansas Department of Correction. The Court has refused to enjoin affirmative future actions of the respondents, particularly minimum funding levels, as discussed herein. However, the Court notes that respondents have voluntarily agreed that reports on various issues will be made on a periodic basis which will then be available for inspection by the public. As pointed out above, the progress made in bringing many areas into compliance is a very recent achievement. Although the Court has concluded that the programs have been in effect for a long enough period that continued policing by the Court is not necessary, agreed internal monitoring by the Department for a period of time will help insure

---

**2.** As was stated on the record at the August 9, 1982 proceeding, no specific findings regarding the particular incident about which the petitioners submitted evidence will be made. The proof established would not support a finding of a pattern or practice of excessive force. Therefore, no basis for relief in this case has been shown even if all facts presented were considered as true, and specific findings concerning the incident are unnecessary.

that the programs will be maintained at the present level and will underscore the importance of continued vigilance. The petitioners requested that reports be required on the issues of the time periods required for the hearing of disciplinary charges, the medical services contract, integration of the East Building of the Cummins Unit, inmate population increases, staffing levels and turnover, mental health services, and the classification system. Letter to the Court from Philip Kaplan, attorney for the petitioners, dated August 4, 1982. At the proceeding on August 9, 1982, the respondents agreed to undertake such a reporting obligation. In fact, the attorney for the respondents stressed the attitude of the respondents that no "backsliding" would be allowed on the results accomplished through the course of this litigation, and stated that plans had already been made for reports to be made, regardless of the requirements of the Court, and that such responsibility would be accepted enthusiastically. The reported intentions of the respondents were to make either monthly or quarterly reports to the Board of Corrections at their regular meetings. Such reports would then be a matter of public record and available for inspection by the press, the attorney for the inmate class, and any other members of the public. Such voluntary reports on a quarterly basis for the next year should be adequate to accomplish the purposes of the petitioners. Therefore, no mandatory injunction is required.

The services of the attorneys for the plaintiff class will no longer be needed. Messrs. Philip Kaplan, Jack Holt, Jr., and Phillip McMath were appointed by the Court to represent the class shortly after the case was filed in 1969. The amount of services required from Messrs. Holt and McMath have varied through the years of the litigation. The greatest load has been carried by Mr. Kaplan, who was the lead attorney and was active in the case the entire time. The role assumed by these gentlemen was both necessary and laudable, but also demanding and often publicly unpopular. The attorneys graciously accepted the appointment by the Court and worked diligently and professionally. It was their persistence, through the adversarial system, which helped to frame the issues and move the case forward to this final point. The Court hereby thanks them for their services to it and to the community, and finds that such services will no longer be needed and that they therefore may be released.

The Court cannot let pass without comment the significance of its finding that the respondents are operating the Arkansas prison system in compliance with the laws of this nation. This is obviously an important and significant achievement in the history of the Department of Correction and of the State of Arkansas. It attests to the vitality of our system of government that this prison system could be so transformed. That this result has been achieved, albeit through the process of litigation, without actual court intervention in the daily administration of the prison, is also significant. Although overseen by the Court, the changes were actually made by the duly constituted state officials who have come to recognize and accept their duty and responsibility to administer the system according to lawful and constitutional standards. *Their* duty, not the Court's.

The progress made cannot be overstated. In the early part of this century, the state prisoners were simply "sold" to the highest bidder as contract labor. Even after the State took on the operation of the prison system as a direct state function, it remained in concept a profit making venture. As late as the early 1960's there were but a handful of paid free-world people operating the entire prison system. Practically all of the jobs now filled by the approximately 1,000 free-world employees were then filled by inmates, including the jobs of keeping records and maintaining security in the institution. The conditions in effect at the time this case was filed caused Judge Henley to appropriately describe the institutional system as a "dark and evil world". *Holt, et al. v. Sarver, et al.,* 309 F.Supp. 362, 381 (E.D. Ark. 1970). To bring the system to the point where it is today required disciplined planning, much physical and mental work, the expenditure of scarce financial and other resources on an unpopular cause,

and the simple determination to do one's lawful duty. It is not possible to mention all of those who have played a role in achieving the result. But such a list would include a succession of governors and state legislators, past and present. It would include a succession of directors and staff members of the Department. It would include the attorneys on both sides and the Compliance Coordinator under the Consent Decree. Importantly, it would include the lowest echelons of the staff, the "C.O.–1's" and their immediate superiors, who most constantly interface directly with the inmates and who have come to understand the importance of their work and to appreciate the dignity and professional status that comes from the fair and even-handed performance of their most difficult duties. Finally, and most importantly, that list must include the heavily burdened taxpayers of Arkansas.

The Court is genuinely pleased that the facts and circumstances mandate its relinquishment of further jurisdiction in this case.

It is therefore further Ordered that the attorneys appointed by the Court to represent the plaintiff class be, and they are hereby, relieved of all further obligations herein.

Finally, it is Ordered that this case be, and it is hereby, dismissed with prejudice.