_____

        No. 95-1565
                   _____

Ernest Smith; Jimmy Rudd,          *
                                   *
        Plaintiffs-Appellees,      *
                                   *
        v.                         *
                                   *
Arkansas Department of             *
Correction; A. L. Lockhart,        *
Director of the Arkansas           *
Department of Correction;          *
                                   *
        Defendants,                *
                                   *
Larry Norris, Acting Director      *
of the Arkansas Department of      *
Correction; Willis H. Sargent,     *
Warden of the Cummins Unit of      *
the Arkansas Department of         *   Appeals from the United States
Correction; A. J. Hall, Major,     *   District Court for the
Chief of Security; R. R. Wood,     *   Eastern District of Arkansas.
Lieutenant, Shift Supervisor;      *
J. Cleveland, Guard; John Hood,    *
Officer; James Banks,              *
Classification and Assignment      *
Officer,                           *
                                   *
        Defendants-Appellants,*
                                   *
Ron Smyers, Medical Services       *
Administrator; John Does, I - X,*
                                   *
        Defendants,                *
                                   *
Dale Reed, Warden, Cummins Unit,*
Arkansas Department of             *
Correction,                        *
                                   *
        Defendant-Appellant.    *
                                   *

_____

No. 95-2744
_____

Linda C. Smith, Administratrix    *
of the Estate of John E.          *
Stewart,                          *
                                  *
          Plaintiff-Appellee,     *
                                  *
     v.                           *
                                  *
Arkansas Department of            *
Correction; A. L. Lockhart,       *
Director of the Arkansas          *
Department of Correction,         *
                                  *
          Defendants,             *
                                  *
Larry Norris, Acting Director     *
of the Arkansas Department of     *
Correction; Willis H. Sargent,    *
Warden of the Cummins Unit of     *
the Arkansas Department of        *
Correction; A. J. Hall, Major,    *
Chief of Security; R. R. Wood,    *
Lieutenant, Shift Supervisor;     *
J. Cleveland, Guard; John Hood,   *
Officer,                          *
                                  *
          Defendants-Appellants,  *
                                  *
James Banks, Classification and   *
Assignment Officer; Ron Smyers,   *
Medical Services Administrator;   *
John Does, I - X,                 *
                                  *
          Defendants.             *

                    _____

          Submitted:  January 8, 1996

              Filed:  December 18, 1996
                    _____

Before MAGILL, REAVLEY,[1] and HANSEN, Circuit Judges.
_____

HANSEN, Circuit Judge.

These two prisoners' civil rights cases arise out of an incident where an Arkansas inmate stabbed two fellow inmates, Ernest Smith and John Stewart, murdering Stewart and seriously injuring Smith. Smith sought declaratory and injunctive relief based on the conditions of his confinement; Smith and Stewart's estate both sought damages based on the stabbing incident. In this consolidated appeal, the Arkansas Department of Correction prison officials appeal the district court's grant of declaratory and injunctive relief requiring additional staffing, the denial of their motions for summary judgment based on qualified immunity, and the district court's grant of partial summary judgment in favor of the plaintiffs on liability.

## I. BACKGROUND

Ernest Smith and John Stewart were both inmates at the Cummins Unit of the Arkansas Department of Correction. During the early morning hours of August 10, 1992, while they were asleep in their beds, they were brutally stabbed by fellow inmate Robert Lewis. Smith was seriously injured, and Stewart died as a result of the attack. Lewis accomplished the act with a hobby craft knife that he had either borrowed or stolen from another inmate within the barracks.

These inmates were all incarcerated together in Barracks No. 8, a large, open, dormitory-style room in the West Hall of the Cummins Unit of the Arkansas Department of Correction. Inmates in the open barracks are free to move about the entire room. Barracks

[1]The HONORABLE THOMAS M. REAVLEY, United States Circuit Judge for the Fifth Circuit, sitting by designation.

3

No. 8 housed 86 general population inmates at the time of this incident and was not staffed with a correctional officer inside the room. Barracks Nos. 5 and 6 are similarly organized and similarly lack the presence of a supervising correctional officer inside them.

Following the stabbing incident, Ernest Smith sought damages for his injuries pursuant to 42 U.S.C. § 1983, claiming that the prison conditions at the time of the attack, including the prison officials' failure to protect him by not posting a guard inside the open barracks, violated his Eighth Amendment right to be free from cruel and unusual punishment in the form of inmate on inmate attacks. Smith also sought injunctive relief to remedy the current conditions of confinement, contending that the prison officials were not complying with the requirements imposed in a prior case. See Finney v. Mabry, 546 F. Supp. 628 (E.D. Ark. 1982). The district court determined that Smith lacked standing to seek injunctive relief for the current conditions of confinement at the Cummins Unit because he had been transferred from that facility over one year prior to the commencement of this suit. For the sake of judicial economy, however, the court allowed Smith to add a co-plaintiff to bring that claim. Smith joined Jimmy Rudd, who was a current resident of the Cummins Unit, for the purpose of seeking injunctive relief to remedy the current conditions of confinement. The administrator of John Stewart's estate filed a separate § 1983 action, seeking damages for the defendants' failure to protect Stewart from the violent attack.

The district court determined that Rudd was not entitled to a jury trial on his equitable claim for an injunction and held a five-day bench trial. In its findings of fact, the district court found that prison policy at the time of the stabbing incident allowed some inmates to possess dangerous hobby craft tools in the open barracks for purposes of making arts and crafts. Subsequent to the filing of this case, however, the prison officials adopted

4

a new policy, which removes all hobby craft tools from the open barracks and thus provides an adequate remedy for the dangers inherent in the old policy.

The district court also determined that the prison officials were inadequately staffing the open barracks and had done nothing to alleviate the dangers posed by this shortcoming. Supervision of the open barracks is provided by one correctional officer stationed in the hallway between two open barracks. This correctional officer monitors the open barracks by looking through the bars, but this officer is not allowed to enter the barracks because he holds the keys. A different correctional officer periodically walks through the barracks to check on the inmates at unscheduled and unrecorded times. No hourly security checks are logged in security records; neither are random hourly security checks listed in the post orders which inform individual officers what is required during their shifts. Although the post orders include a requirement for random security checks, the court found no indication that random checks must be (or were) accomplished hourly as required by Finney, 546 F. Supp. at 640. The district court credited the testimony of various correctional officers, some of the defendants, and many inmate witnesses, which indicated that random hourly security checks in fact were not made.

The district court concluded that even assuming the defendants were complying with the standards found to be adequate in Finney, the evidence now proves that those standards are inadequate to guarantee inmate safety in the open barracks. Prison records do demonstrate that an officer had walked through the barracks for a security check only ten minutes before Smith and Stewart were violently attacked. Consequently, the district court concluded that even compliance with the random hourly security check found to be adequate in Finney would not have provided the inmates with adequate protection.

5

Additionally, the district court found that a great deal of both reported and unreported criminal activity goes on at night in the open barracks that is not deterred by periodic security checks. Since 1986, reports by independent investigators have indicated that operating large, open barracks with no correctional officer stationed inside presents a serious danger to the inmates so housed. In 1986, the Arthur Young Company, at the request of the Arkansas legislature, compiled two reports concerning the conditions in the open barracks at the Cummins Unit. The first report found that the absence of correctional officers inside the barracks "is contrary to the most fundamental security and safety practices." (Appellants' Addend. at 14.) It also noted that "the almost total lack of direct monitoring could be resulting in the criminal activities currently being charged." (Id.) The report recommended that at least two correctional officers be stationed inside each of the open barracks whenever the majority of the inmates are present there. The second Arthur Young report stated that "[h]ousing units of 100 inmates with no direct supervision cannot be thought to be under control." (Id. at 16.) Again, the second report recommended at least two correctional officers for each open barracks.

In 1989, the United States Department of Justice investigated the situation and notified then Governor Clinton that the staffing and supervision at the Cummins Unit were inadequate to ensure the safety of inmates, especially those inmates in the crowded dormitories. The Justice Department recommended that a minimum of 92 additional correctional officers would be needed to ensure inmate safety. To avoid a Justice Department lawsuit challenging the conditions at the state's prisons, the State of Arkansas entered into an agreement with the Justice Department to implement the additional staff recommendations. Funding was approved in 1991 but was subsequently cut back, providing for only 62 additional staff members. At the time of trial, however, the parties stipulated that all 92 positions had been funded.

A 1991 report by the Department of Justice specifically recommended that two correctional officers should be posted in each of the large open dormitories during the night shift. The Arkansas Department of Correction determined that four new positions should be created for each of the open barracks. As of April 22, 1992, a list outlining where the new positions are located showed that sixteen new correctional officers had been assigned to the four open, inadequately supervised barracks. At the time of trial in February 1995, one of the four open barracks was adequately staffed, but the three others, including Barracks No. 8, still did not have an officer regularly stationed inside them as contemplated by the agreement.

The district court found that the State of Arkansas has avoided costly litigation by agreeing to implement these staffing changes and the legislature has provided funding for additional staff, yet to date it has not complied with the agreement. The prison officials argued that they had not staffed the barracks with the new correctional officers because in their professional judgment, the additional officers were needed in other parts of the prison. The court dismissed this as a feeble post hoc rationalization since the prison officials had earlier agreed that staffing inside the barracks was a high priority. The court found that these problems have existed for years and that the defendants have recognized the problems and agreed to an appropriate solution, yet nothing has been done. Based upon all of the facts, the district court concluded that the prison officials had not been and were not currently meeting their constitutional duty to reasonably protect inmates in the open barracks from danger.

To remedy this situation, the district court granted Rudd's request for declaratory and injunctive relief. The injunction requires the defendants to station at least two correctional officers inside the open barracks at issue and to document and record all entries and exits of prison personnel into or out of the

7

open barracks.  To demonstrate compliance, the court required the defendants to make periodic progress reports, the last of which was due in December 1995.  The court did not grant Rudd's request for specific orders to remedy the need for quick response procedures, effective communication devices, or shakedown policies, but instead permitted the prison officials, in their discretion, to fashion an appropriate remedy to meet these problems.

In Smith's § 1983 action, the district court determined that the defendants are not entitled to qualified immunity on Smith's claim for damages and that Smith is entitled to partial summary judgment on the issue of liability for the injuries he suffered in the stabbing incident.  Thus, only the issue of Smith's damages remains for trial.  The district court denied Smith's claim for injunctive relief based upon the prison's hobby craft policy, which allowed inmates in the open barracks to possess dangerous tools such as hobby craft knives, because the new hobby craft policy implemented by the prison since this litigation began satisfies all constitutional concerns on this issue.

In the Stewart estate's § 1983 case, the district court determined that the issues are exactly the same as those litigated in the Ernest Smith and Jimmy Rudd case.  Accordingly, the court concluded that the doctrine of collateral estoppel bars the defendants from relitigating the issues of qualified immunity and liability.  The prison officials in each case appeal.

## II. DISCUSSION
### A. Injunctive Relief

Before proceeding to the merits of the injunction, we address two preliminary issues.  The first is the question of mootness. The injunction issued in Jimmy Rudd's case required the defendants to file reports detailing their compliance.  Reports were due on

8

May 1, 1995, August 1, 1995, and December 1, 1995. The injunction order concluded as follows:

> If no report or challenge is filed setting forth any violation of the Court's orders, before December 31, 1995, then and in that event, the injunction granted hereby shall expire without further action by the Court, otherwise to continue in full force and effect. After the expiration of the injunction, the Court assumes that defendants will continue to staff and operate the open barracks in compliance with the Constitution.

(Appellant's Addend. at 2.) The defendants timely filed the required reports. Rudd filed responses, suggesting methods for documenting and verifying compliance by the prison officials but setting forth no violations of the district court's injunction.

By its own terms, therefore, the injunction issued in this case expired on December 31, 1995. Because the injunction has expired and Rudd has alleged no further violations of the district court's order, this issue appears to be moot. See generally Hedberg v. State Farm Mut. Auto. Ins. Co., 350 F.2d 924, 933 (8th Cir. 1965) ("There are instances where the Supreme Court and this court have dismissed as moot appeals where the injunctive period has passed or where the situation toward which the injunction was directed has ceased to exist.") (citations omitted). The prison officials contend that the injunction is not moot, however, because the question of its validity is a question "capable of repetition, yet evading review." Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603 (1982) (internal quotation omitted). "This doctrine applies if `(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.'" McFarlin v. Newport Special Sch. Dist., 980 F.2d 1208, 1211 (8th Cir. 1992) (quoting Murphy v. Hunt, 455 U.S. 478, 482 (1982)). "The party need not show with certainty that the situation will recur, but a mere

9

physical or theoretical possibility is insufficient to overcome the jurisdictional hurdle of mootness."  Van Bergen v. State of Minn., 59 F.3d 1541, 1547 (8th Cir. 1995).

In this case, the injunction expired shortly after the prison officials fulfilled their reporting requirements.  The injunction was therefore too short in duration to be fully litigated before its expiration.  Furthermore, the effect of the injunction has not been eliminated.  The district court expressly stated, "After the expiration of the injunction, the Court assumes that defendants will continue to staff and operate the open barracks in compliance with the Constitution" -- presumably as set forth in the district court's order.  (Appellant's Addend. at 2.)  If we deem the issue moot, then there is a reasonable probability that the complaining parties (in this instance, the prison officials) will face a situation where they must either continue to comply with the requirements of an order that has evaded appellate review or most assuredly be subjected to further prisoner litigation for their noncompliance.  Thus, we conclude that the injunction issue is not moot but "`capable of repetition, yet evading review.'"  Id. (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)).

The second preliminary issue we must address is that of standing.  As a prerequisite to any inquiry about the conditions of confinement, as with all claims, an inmate seeking relief must satisfy basic constitutional standing requirements.  This requires Rudd to demonstrate, among other things, either an actual or imminent injury in fact.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  See also Lewis v. Casey, 116 S. Ct. 2174, 2179 (1996) (stating that the court's role is "to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm").  "The courts should not get involved unless either a constitutional violation has already occurred or the threat of such a violation is both real and immediate."  Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982).

10

We bear in mind, however, that an inmate "`does not have to await the consummation of threatened injury to obtain preventive relief.'" Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 1983 (1994) (internal citation omitted).

At the time he joined this suit, Rudd was a resident of Barracks No. 8, one of the unsupervised open barracks at the Cummins Unit. In his trial testimony, Rudd did not specifically state that he fears an imminent threat of harm from the prison conditions. Nevertheless, Rudd's testimony and his other evidence clearly indicate that he, along with every inmate living in the open barracks, is subjected to an imminent threat of harm in these conditions. Rudd admitted that he has stolen from and harmed other inmates in the open barracks and that he often has trouble sleeping for fear of retaliation against him. The parties stipulated to the several reports summarized above, which all warn of the danger to inmates living in open and unsupervised barracks. The thievery, assaults, and hand-crafted weapons that are common in the unsupervised environment of the open barracks illustrate its inherent danger. Accordingly, Rudd has satisfied the constitutional requirement of demonstrating that he suffers from the threat of imminent harm.

Turning now to the merits of the injunction, we review the district court's grant of injunctive relief for an abuse of discretion. Hosna v. Groose, 80 F.3d 298, 303 (8th Cir.), cert. denied, 117 S. Ct. 164 (1996). "`Abuse of discretion occurs if the district court rests its conclusion on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions.'" Id. (quoting International Ass'n of Machinists & Aerospace Workers v. Soo Line R.R., 850 F.2d 368, 374 (8th Cir. 1988) (en banc), cert. denied, 489 U.S. 1010 (1989)). The prison officials appeal the district court's grant of equitable relief to Jimmy Rudd, arguing that the grant of an injunction in this case amounts to an abuse of discretion.

11

The Eighth Amendment to the United States Constitution, which proscribes cruel and unusual punishments, "`does not mandate comfortable prisons'" but does impose a duty on prison officials "to provide humane conditions of confinement." Farmer, 114 S. Ct. at 1976 (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). Among other things, this duty requires prison officials to take reasonable steps to protect inmates from violence and assault by fellow inmates, because being subjected to violent assault is not "`part of the penalty that criminal offenders [must] pay for their offenses.'" Jensen v. Clarke, 73 F.3d 808, 810 (8th Cir. 1996) (quoting Rhodes, 452 U.S. at 347). To prevail on a claim of failure to protect, prisoners must demonstrate "that they are `incarcerated under conditions posing a substantial risk of serious harm'" and that the prison officials subjectively knew of and disregarded that safety risk. Id. (quoting Farmer, 114 S. Ct. at 1977); see also Jensen v. Clarke, 94 F.3d 1191, 1197 (8th Cir. 1996) (Jensen II) (explaining the two essential showings necessary to a failure-to-protect case). An inmate seeking injunctive relief on a failure-to-protect claim must adequately plead a violation of prison officials' duty to protect; moreover

> to survive summary judgment, he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future. . . . If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief.

Farmer, 114 S. Ct. at 1983 (citing Hutto v. Finney, 437 U.S. 678, 685-88 & n.9 (1978)). The prison officials may defend against a failure-to-protect claim on the basis that they responded

12

reasonably to the known risk of harm.  Id. at 1982-83; Jensen II, 94 F.3d at 1197.

In this case, the district court determined that Rudd was living in conditions that constituted a substantial risk of serious harm and that the prison officials knew of but disregarded this safety risk.  After reviewing the record, we conclude that the district court did not rely on either clearly erroneous findings of fact or make erroneous legal conclusions in issuing the injunction.

The evidence adduced from witnesses and stipulated reports indicates that violence, robbery, rape, gambling, and use of weapons by inmates are prevalent in the open, unsupervised barracks.  Rudd's testimony illustrates the danger inherent in the open, unsupervised barracks.  Rudd testified that he is sometimes unable to rest at night, but he believes he can take care of himself better than the guards because he has a weapon, as do other inmates, and the guards do not.  He said that he would rather be caught with a weapon by a guard than be caught without one by a fellow inmate in the open barracks.

We acknowledge that Rudd is not a blameless victim in this scenario.  His own misdeeds have often bred his inability to rest at night because he feared retaliation from inmates whom he has harmed.  Nevertheless, it is painfully obvious that Rudd's own misdeeds and the violence of other inmates thrive in the open barracks due to the lack of supervision.  The dangers of the open barracks are further illustrated by the incident where Smith and Stewart were violently stabbed while asleep in their beds. Response time on the part of correctional officers to disarm such volatile situations is limited because the guard in the hallway cannot enter the barracks while in possession of the keys, even if an altercation is in progress.  The evidence clearly supports the existence of an objectively substantial risk of personal injury to Rudd and others who live in these conditions.  The evidence also

13

supports the court's finding that the prison officials were aware of this objectively intolerable risk of harm and subjectively disregarded it. Finding no clear error of fact or law, we conclude that the district court did not abuse its discretion in granting injunctive relief for this constitutional violation.

We note that the open barracks at the Cummins Unit have been a source of frequent litigation since the 1960s. See Hutto v. Finney, 437 U.S. 678, 681 & n.2 (1978) (and cases cited therein); Finney v. Mabry, 546 F. Supp. at 629-30 & 639-40. In a previous, unrelated case, our brother Henley, then Chief Judge of the United States District Court for the Eastern District of Arkansas, stated as follows:

> that if the State of Arkansas chooses to confine penitentiary inmates in barracks with other inmates, they ought at least to be able to fall asleep at night without fear of having their throats cut before morning, and that the State has failed to discharge a constitutional duty in failing to take steps to enable them to do so.

Holt v. Sarver, 300 F. Supp. 825, 831 (E.D. Ark. 1969). Unfortunately, Judge Henley's conclusion rendered more than 25 years ago bears repeating.

We reject the prison officials' contention that the district court erred by ignoring Rudd's own testimony, in which, they contend, he does not allege any concern for his own personal safety. We agree that Rudd's testimony alone does not render him a model candidate for equitable relief. As we indicated earlier in our discussion, however, Rudd's testimony together with his other evidence suffices to demonstrate that he was subjected to prison conditions that present a substantial risk of serious harm. Thus, the district court did not clearly err.

14

Additionally, we have considered whether the district court abused its equitable power and imposed a remedy beyond the scope of the injury, within the meaning of Lewis v. Casey, 116 S. Ct. 2174 (1996). In Lewis, the Court warned against the dangers of allowing district courts to fashion excessively intrusive, systemwide remedies absent a systemwide injury; the remedy must not go beyond what is necessary to remedy the particular constitutional injury. See 116 S. Ct. at 2184-85. In assessing the nature of the constitutional injury and the scope of the remedy in this case, we conclude that the remedy does not go beyond the scope of the injury. We are not prepared to hold that stationing two correctional officers inside a crowded open barracks is a constitutional necessity in every case, but we agree that here it was a reasonable remedy, narrowly tailored to the constitutional injury in this case, as shown by the evidence.

Unlike in Lewis, the injury here stems from living in and thus being subjected to the perils of the crowded, unsupervised open barracks. To suffer a constitutional injury in the denial-of-access-to-the-courts situation discussed in Lewis, each individual plaintiff must demonstrate prejudice, and an individual remedy will be adequate for each injured plaintiff. To the contrary, in the conditions-of-confinement challenge of the case before us, Rudd and all the inmates living in the same room are similarly subjected to the same unconstitutional condition, and no individual remedy will be adequate unless it eliminates the unconstitutional condition in the barracks as a whole, which necessarily benefits all the inmates residing there. It would have made little sense to further narrowly tailor the remedy by ordering a guard whose duty would be to protect just Rudd. Because Rudd's injury cannot be remedied on a more individualized basis, we conclude that the district court "carefully tailored" the remedy to the specific harm suffered by the plaintiff. Butler v. Dowd, 979 F.2d 661, 674 (8th Cir. 1992), cert. denied, 508 U.S. 930 (1993); see Brown v. Trustees of Boston Univ., 891 F.2d 337, 361 (1st Cir. 1989) ("[A]n injunction is not

15

necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in a lawsuit -- even if it is not a class action -- if such breadth is necessary to give prevailing parties the relief to which they are entitled.") (internal quotations and alterations omitted), cert. denied, 496 U.S. 937 (1990).

In Lewis, the Supreme Court also stressed that district courts must accord adequate deference to the judgment of the prison authorities when considering an appropriate remedy. See 116 S. Ct. at 2185. The prison officials in this case complain that the district court did not accord sufficient deference to their judgment that the additional personnel could be best used in other areas. We disagree.

The district court judge in this case has a record of giving the prison officials at the Cummins Unit the first opportunity to apply their expertise to fashion a remedy for the open barracks problem, which has existed for many years. See Finney, 546 F. Supp. 628 (E.D. Ark. 1982); Finney v. Mabry, 534 F. Supp. 1026 (E.D. Ark. 1982). At least since 1986, the prison officials have known of the continuing safety concern inherent in the open barracks, and they have formally and consensually agreed to implement the Department of Justice recommendations for additional staffing. Thus, it was originally the prison officials' discretionary professional judgment, not the court's, that the open barracks need additional personnel, and the legislature responded to that need by providing funding for the additional staff. Yet, the prison officials had not implemented the agreed upon additional staffing recommendations by the time of trial -- four years after they agreed that it was appropriate and necessary. The prison officials undoubtedly were given the first opportunity to cure the problem. The district court's injunction merely gave force to the prison officials' professional judgment after they demonstrated their reluctance to implement the agreed-upon solution. The

16

district court specifically denied Rudd's request that it impose more specific procedures regarding the guards' ability to make a quick response, the need for effective communication devices, and specific shakedown policies. In light of the evidence in this case, the district court did not abuse its equitable power by requiring the Department of Correction to abide by its agreement to place additional staff in the open barracks.

For the same reasons, we also conclude that Rudd's failure to file a prison grievance complaining of the conditions of confinement is not fatal to his claim. In Farmer, the Supreme Court counseled that "[w]hen a prison inmate seeks injunctive relief, a court need not ignore the inmate's failure to take advantage of adequate prison procedures, and an inmate who needlessly bypasses such procedures may properly be compelled to pursue them." 114 S. Ct. at 1984. The Court explained that this requirement flows from the concept that a litigant seeking the court's equity jurisdiction "must show that the intervention of equity is required." Id. Also, by giving prison officials the first opportunity to address the situation through the prison grievance procedure, the district court respects its own limited role in prison administration. See Lewis, 116 S. Ct. at 2185. Rudd's failure to file a grievance is not fatal in this case, however, because he has nevertheless demonstrated that the intervention of equity is required and that the prison officials, though given the first opportunity to fashion a remedy for the situation, have failed adequately to do so. Given the prison officials' long-standing reluctance to implement the necessary supervision of the open barracks, we do not believe that one prisoner's grievance complaining of the situation would have had any significant impact.

Since oral argument in this case, Congress has enacted the Prison Litigation Reform Act of 1995, 18 U.S.C. § 3626. We requested supplemental briefing on the potential effect of this Act

17

on the present appeal. The Act provides that the power to grant injunctive relief "in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). The Act also provides that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." Id.

The district court did not have an opportunity to apply this statute in the first instance, but we are satisfied, and the parties agree, that the Act merely codifies existing law and does not change the standards for determining whether to grant an injunction. See Williams v. Edwards, 87 F.3d 126, 133 (5th Cir. 1996). We conclude that the district court applied the appropriate standards, and in any event, the injunction expired well before the enactment of the Prison Litigation Reform Act. Accordingly, we need not address this issue further.

We conclude that the district court did not abuse its discretion in granting Jimmy Rudd's request for injunctive relief.

## B. Summary Judgments

In Ernest Smith's 42 U.S.C. § 1983 action for damages arising out of the brutal attack by fellow inmate Lewis, the defendant prison officials moved for summary judgment on qualified immunity grounds, asserting that they acted in conformity with the clearly established law as set forth in Finney v. Mabry, 546 F. Supp. 628 (E.D. Ark. 1982), and could not reasonably have known that compliance with Finney would violate Smith's constitutional rights. The district court assessed the facts and concluded that the prison officials had not complied with the requirements of Finney. Thus,

18

the district court denied their request for qualified immunity. Further, the district court granted partial summary judgment to Smith on the issue of liability, saving only the issue of damages for trial. The prison officials appeal both the district court's denial of qualified immunity and the district court's grant of partial summary judgment on liability. We conclude that the district court erred by resolving issues of disputed fact in a summary judgment context.

When a district court denies a summary judgment motion based on qualified immunity, we view the facts in the light most favorable to the nonmoving party and consider "`whether the facts as alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law.'" Johnson v. Jones, 115 S. Ct. 2151, 2156 (1995) (quoting Mitchell v. Forsyth, 472 U.S. 511, 528 n.9 (1985)). We have jurisdiction "to examine the information possessed by the government official accused of wrongdoing in order to determine whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law." Miller v. Schoenen, 75 F.3d 1305, 1308 (8th Cir. 1996) (citing Reece v. Groose, 60 F.3d 487, 489 (8th Cir. 1995)).

The district court's prior opinion in 1982 in the Finney case sets forth the clearly established law with which the defendants must demonstrate compliance. The Finney litigation involved a comprehensive review of the Arkansas prison system. Specifically, the district court addressed a number of challenges to the conditions of confinement at the Cummins Unit, including the problems of overcrowding and violence in the open barracks. 546 F. Supp. at 639-40. The district court, in a proper display of judicial restraint, allowed the Department of Correction to devise its own remedy for the unconstitutional conditions and specifically "avoid[ed] imposing any specific solution which could cause a hardship for the Department." Id. Upon final review of the

19

Department's proposed solution, the district court found: "The alternative solution now devised by the respondents is adequate to bring the security in those open barracks to an acceptable level without requiring a population reduction." Id. at 640. The court then listed the changes that the Department had made. Inmates were no longer allowed to stack beds or hang sheets or clothing from their beds, and the lighting had been increased in order to make continual visual supervision possible. Id. Also, the Department was conducting random "shake downs" to curtail contraband, an officer was always present in the hallways to visually monitor the barracks, and a patrol officer entered and inspected each open barracks "at least once an hour at irregular times." Id. The district court concluded:

> The Court has determined that these measures, if continued as represented to the Court, are sufficient to provide adequate safety and inmate security in the open barracks despite the numbers of inmates now housed there. Therefore, no order requiring a reduction of the population in those barracks will be entered. If the respondents continue the security measures as represented to the Court, they will be in compliance with the requirements of the Constitution, the Consent Decree, and all prior orders of the Court on the issue of inmate safety and overcrowding in the open barracks.

Id.

Thus, in Finney, the district court allowed the prison officials to devise their own solution to the overcrowding and supervision problems in the open barracks, and the district court adopted those solutions as providing constitutional minimum conditions of confinement. The prison officials now argue that "Finney, in reality, did not establish any requirements for security in the open barracks." (Appellants' Br. at 46-47.) We disagree. While the "requirements" set forth in Finney may not be inflexible, they certainly represent the constitutional minimum conditions that the court required to be maintained at the Cummins

20

Unit. Thus, the district court in this case properly measured the prison officials' conduct and knowledge against the standards set forth in Finney.

The district court's ultimate finding that the prison officials were not acting in compliance with Finney, however, is beyond the scope of a summary judgment proceeding. Material issues of fact and credibility were present that precluded granting summary judgment to the prison officials on the ground of qualified immunity. See Ludwig v. Anderson, 54 F.3d 465, 473 (8th Cir. 1995). Smith presented evidence from which a reasonable juror could conclude that the prison officials were not in fact complying with Finney, as the testimony of some witnesses and the stipulated reports indicated that regular security checks were not being made. On the other hand, the evidence also indicated that a correctional officer had walked through the barracks only minutes before the attack and that a guard had been posted out in the hall all night. Prison officials testified that they had instructed officers to make the security checks and that they were under the impression that they were in fact being made. Further, the officer responsible for making rounds on the night of the assault testified that hourly checks were made, though he could not remember at what times they were made. Additionally, though not regulated by Finney, prison officials knew of the presence of hobby craft tools and the danger posed by them from Department of Justice reports that specifically set forth the risk inherent in the hobby craft policy.

Viewing the evidence in the light most favorable to the nonmoving party, there exists a material dispute of fact concerning whether the prison officials were complying with the terms of Finney and providing adequate protection to inmates. To conclude definitively that the defendants were not complying with Finney, as it did, the district court made credibility assessments, weighed the conflicting evidence presented, and resolved disputed issues of

fact.  See Mem. Op., filed Feb. 23, 1995, at 25 ("The defense of qualified immunity, to be of any value, must usually be disposed of before trial.  In the great majority of the cases, the facts are not in dispute and the issue is therefore one of law.  This, however, is not such a clear cut case.") (emphasis added); id. at 28 ("Mr. Smith contends that security checks were almost never made.  The defendants contend that they were made routinely on an hourly basis as required by Finney.  The Court finds that such security checks were made on an irregular and random basis . . . .") (emphasis added); id. at 32 ("The Court has heard and considered the testimony of the witnesses for both the plaintiff and the defendants and has received and considered the documentary evidence, and finds therefrom that the requirements of Finney have not been adhered to, or followed, in recent years, and certainly not since the first of 1992.") (emphasis added); id. at 30 ("Generally the Court was impressed by the credibility of Sergeant Johnson, but felt that he was under pressure to support the ADC's claimed adherence to the Finney security check requirement while knowing that such was not the case.").  This is improper in the summary judgment context. We conclude that the district court took the evidence presented on the equitable claim for an injunction and used it to decide the disputed issues of fact not only on the injunction issue but also on the qualified immunity issue.  We conclude that "[t]he evidence in this case presents material issues of fact on which the issue of qualified immunity turns and `presents a sufficient disagreement to require submission to a jury.'" Ludwig, 54 F.3d at 474 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).  Accordingly, though for a different reason than that articulated by the district court, we conclude that the district court's denial of the prison officials' motion for summary judgment on grounds of qualified immunity must be affirmed.  See Dicken v. Ashcroft, 972 F.2d 231, 233 (8th Cir. 1992) (court of appeals may affirm district court on any basis supported by the record).

22

The same factual dispute that precludes a grant of qualified immunity -- whether the prison officials were actually complying with the requirements of Finney at the time of the incident -- also precludes summary judgment in favor of Smith on the issue of liability. In an appeal from the denial of qualified immunity, we do not have jurisdiction to address any issues that are not themselves immediately appealable unless they are "inextricably intertwined" with the qualified immunity determination of whether the alleged facts support a violation of clearly established law. Swint v. Chambers County Comm., 115 S. Ct. 1203, 1212 (1995); Kincade v. City of Blue Springs, Mo., 64 F.3d 389, 395 (8th Cir. 1995), cert. denied, 116 S. Ct. 1565 (1996). Partial summary judgment on the issue of liability would not ordinarily be immediately appealable. See Swint, 115 S. Ct. at 1208 ("a mere defense to liability" is not immediately reviewable). In this case, however, the material dispute of fact that precludes a grant of qualified immunity is not only "inextricably intertwined" with, but is precisely the same issue of fact that precludes summary judgment on liability. Id. at 1212. The district court granted summary judgment on the issue of liability only because it first found that no reasonable juror could conclude that the prison officials had complied with Finney. Thus, we have jurisdiction to consider this issue. Our independent review of the record convinces us, as we have demonstrated above, that disputed issues of fact exist on Smith's § 1983 Finney noncompliance claim. We respectfully disagree with the district court's conclusion that the evidence is so one-sided regarding what happened on the night Smith was stabbed that no reasonable juror could conclude that the officials had complied with the clearly established law.

Because we conclude that a material question of fact exits on the issue of whether the prison officials complied with Finney, the premise on which the district court granted partial summary judgment establishing liability no longer exists. The material dispute of fact that precludes summary judgment on the ground of

23

qualified immunity also precludes summary judgment on the issue of liability under a <u>Finney</u> theory. With respect to the district court's grant of summary judgment establishing liability against the defendants based on the prison's policy of permitting inmates to have hobby craft tools, including sharp knives, in the open barracks, we note that the court held that that policy, in combination with the staffing shortcomings the district court had found, created a pervasive risk of harm. To reach such a conclusion, the court relied on its own factual findings. <u>See</u> Mem. Op., filed Feb. 23, 1995, at 39. Accordingly, we must reverse the district court's grant of partial summary judgment on liability and remand Smith's § 1983 case for a trial on the merits.

In the John Stewart estate's case, we conclude for the same reasons that the district court properly denied the prison officials' request for qualified immunity but improperly granted summary judgment on the issue of liability. We have no jurisdiction in this qualified immunity appeal to review the district court's decision that the defendants' failure to respond to the Administratrix's Requests for Admissions results in the requests being deemed admitted. The district court did not rely on any of the deemed admissions in reaching its decision with respect to the defendants' qualified immunity motion. This discovery dispute is not "inextricably intertwined" with the qualified immunity issue, and its resolution must await the appeal from the final judgment if any is taken. This case must also be remanded for a trial on the merits.

### III. CONCLUSION

We affirm the district court's grant of injunctive relief to Jimmy Rudd. In each § 1983 case, we affirm the denial of qualified immunity but reverse the grant of summary judgment on the issue of liability. We remand the § 1983 claims in each case for a trial on the merits.

24

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.